## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 09-422-CJB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

John S. Grady, GRADY & HAMPTON, LLC, Dover, Delaware, Attorney for Plaintiff.

Charles M. Oberly, III, United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF DELAWARE, Wilmington, Delaware; Patricia A. Stewart, Special Assistant United States Attorney; Eric P. Kressman, Regional Chief Counsel; Lori Karimoto, Assistant Regional Counsel; Dina White Griffin, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.

## MEMORANDUM OPINION

July 5, 2013
Wilmington, Delaware

1

*Christopher J. Burke*

**BURKE, U.S. Magistrate Judge**

Plaintiff Robert Smith ("Smith" or "Plaintiff") appeals from a decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner" or "Defendant"), denying him application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Smith and the Commissioner. (D.I. 12, 15)  Smith asks the Court to reverse the Commissioner's decision and order benefits or remand for further proceedings. (D.I. 13 at 25)  The Commissioner opposes this motion and requests that the Court affirm his decision. (D.I. 16 at 35)  For the reasons set forth below, Smith's motion for summary judgment will be GRANTED-IN-PART and DENIED-IN-PART and the Commissioner's motion for summary judgment will be DENIED.  The case will be remanded for further proceedings consistent with this Memorandum Opinion.

## I.   BACKGROUND

### A.   Procedural History

Smith filed his claim for DIB on April 11, 2007, alleging disability beginning on August 25, 2006. (D.I. 11 ("Transcript" and hereinafter "Tr.") at 101-07, 124, 129; D.I. 13 at 1)  His claimed period of disability ran through December 31, 2010, the date he was last insured for disability benefits. (*Id.* at 10)

Smith's application was denied on June 8, 2007. (Tr. at 74-78)  On June 14, 2007, Smith filed a request for reconsideration, and on July 12, 2007, the application was denied again. (*Id.* at

2

79-84) On August 14, 2007, Smith filed a request for a hearing (the "hearing") before an

Administrative Law Judge ("ALJ"). (*Id*. at 85) The hearing, before ALJ Melvin D. Benitz, was

held on May 1, 2008. (*Id*. at 21-68) On June 10, 2008, the ALJ issued a decision confirming the

denial of benefits to Smith. (*Id*. at 7-20) Smith requested a review of this decision by the

Appeals Council, but that request was denied on May 12, 2009. (*Id*. at 1-6) The June 10, 2008

decision therefore became the final decision of the Commissioner. (*Id*. at 1); *see also* 20 C.F.R.

§§ 404.900(a)(4)-(5), 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On June 9, 2009, Smith filed a Complaint in this Court seeking judicial review of the

ALJ's June 10, 2008 decision. (D.I. 2) On July 21, 2010, Smith filed his motion for summary

judgment. (D.I. 12) The Commissioner opposed Smith's motion and filed a cross-motion for

summary judgment on August 19, 2010. (D.I. 15) On March 28, 2012, this case was referred to

the Court by Judge Richard G. Andrews to hear and resolve all pretrial matters. On April 24,

2012, the parties consented to the Court presiding over all proceedings in this case, including

trial, the entry of final judgment, and all post-trial proceedings. (D.I. 18)

**B.     Factual Background**

At the time of the hearing, Smith was 48 years old. (Tr. at 26, 101) He has an eighth

grade education (*id*. at 26, 134), and was last employed full-time in August of 2005, when he

worked as a maintenance director at a nursing home (*id*. at 27-29, 59, 129-30).

**1.     Plaintiff's Medical History, Treatment, and Condition**

Smith alleges that he became disabled on or about August 25, 2006 because of coronary

disease, hyperlipidemia, hypertension, and COPD. (Tr. at 101, 129) He asserts that he remains

unable to work because these conditions cause him to suffer chronic fatigue and shortness of

breath. (*Id.* at 31-32)

a.    **Medical History Through 2004**

On April 9, 2002, Smith visited David Ramos, M.D., a cardiologist, for the first time, in order to determine whether Smith could take certain medication. (Tr. at 242)  Smith reported to Dr. Ramos that he had not seen a cardiologist in the previous four years and was seeking further cardiac evaluation. (*Id.*)  Smith told Dr. Ramos that he had his first episode of chest pain when he was 25 years old, but that he did not seek medical attention because it went away. (*Id.*)  A few years later, he again experienced chest pain and was admitted to a hospital, where he was told he sustained myocardial infarction (a heart attack). (*Id.*)  A few years after that, he had additional chest discomfort, was again admitted to a hospital, and was told he had another heart attack. (*Id.*)  Smith reported that he had not had chest pain in approximately ten years. (*Id.*)  Dr. Ramos noted that Smith had been told of the need to stop smoking but had been unable to do so and did not seem motivated to do so. (*Id.*; *see also id.* at 244)

Dr. Ramos reviewed an exercise stress test from a year and a half before Smith's visit, and described it as "horrible looking" with a "severely diminished left ventricular ejection fraction [("LVEF" or "ejection fraction")] of 11%." (Tr. at 243-44)  He ordered a new stress test on Smith. (*Id.* at 244)  The results of that new stress test showed Smith's ejection fraction had improved from 11% to 23%. (*Id.* at 241)  The conclusion of the study indicates "normal treadmill stress test at an adequate level of exercise" and "no evidence of exercise induced ischemia. . . ." (*Id.* at 240)

At a May 1, 2002 follow up visit, Dr. Ramos categorized the change in Smith's ejection fraction as "a quite dramatic improvement," noting that "[i]t is however still less than half of

4

what it should be." (Tr. at 238)  Dr. Ramos noted that Smith's multiple heart attacks were "directly related to him smoking since there is no evidence for critical coronary artery disease by cardiac catheterization" and noted that he told Smith that he "did not expect [Smith] would have anywhere near normal prognosis if he continues to smoke." (*Id.*)

In visits in August and October 2002 with Dr. Ramos, Smith was reported to be "doing pretty well" from a cardiac standpoint. (Tr. at 232-36)  Dr. Ramos had repeated discussions with Smith about how smoking "was the root cause of all his problems" and how Smith needed to quit. (*Id.* at 236)

At Smith's March 14, 2003 visit to Dr. Ramos, Smith reported that he was "able to perform all his usual activities without difficulty." (Tr. at 231)  Dr. Ramos asked him to work harder on his diet and increasing his exercise (as Smith's weight had continued to rise mildly) and to work harder to quit smoking, since that was Smith's single biggest risk factor for his ischemic dilated cardiomyopathy. (*Id.*)

On October 7, 2004, Smith underwent an echocardiogram, which showed normal left ventricular systolic function and a left ventricular ejection fraction of 25%. (Tr. at 228-29)  It further showed severe left ventricular cavity enlargement and moderate left atrial enlargement, as well as regional wall motion abnormalities consistent with ischemic dilated cardiomyopathy. (*Id.*)

### b.    2005–2006

Smith was laid off from his job at the nursing home in August of 2005. (Tr. at 28)

On October 17, 2005, Smith returned to Dr. Ramos' practice.  Notes from that visit indicate that Smith had been noncompliant with follow-up for the previous two and a half years.

5

(Tr. at 225) Smith explained that he had been taking his heart-related medications for most of the time since his last visit (having stopped for a period of time due to difficulty in affording them) and had not had a myocardial infarction in that time. (*Id.* at 226-227) Dr. Ramos noted that Smith needed to be on Coumadin to prevent the risk of recurrent cardioembolic stroke, but Smith's "level of compliance does not make him a good candidate" for the drug. (*Id.*) An echocardiogram was ordered to reassess left ventricular functioning, and Dr. Ramos noted that if Smith had, indeed, been compliant with taking his medication, Dr. Ramos "would anticipate improvement in [Smith's] LV ejection fraction." (*Id.*) Dr. Ramos told Smith "that the root cause of his cardiovascular disease is his continued smoking" but noted that "he really shows zero inclination to quit." (*Id.*)

Smith met again with Dr. Ramos' office on December 15, 2005, following lab testing and cardiac studies ordered at the October visit. (Tr. at 217) Dr. Ramos' colleague noted that the echocardiogram showed Smith's LV ejection fraction was approximately 25%. (*Id.* at 218) A stress test was stopped after close to eight minutes, due to Smith's shortness of breath; its results showed no ischemic EKG changes and a calculated LVEF at 13%. (*Id.* at 219) Smith reported no chest pain, pressure, heaviness, or tightness. (*Id.*) Dr. Ramos' colleague noted "[i]t is amazing to me that he is as functional as he is able to be with the massive left ventricular enlargement and severely dilated cardiomyopathy that he has had for many years now. Indeed, his first myocardial infarction occurred at the age of 25 and he has had multiple myocardial infarctions primarily because of his extreme noncompliance. He has continued to smoke and has absolutely zero desire to quit and does not even want to discuss it." (*Id.*) Upon Smith's representation that he would be compliant, Smith was started on Coumadin. (*Id.*) An evaluation

by an electrophysiologist for possible implantable defibrillator was ordered. (*Id.*)

On January 18, 2006, Smith was implanted with an implantable cardioverter-defibrillator ("ICD"), a surgery performed by Henry L. Weiner, M.D. (Tr. at 180)

On February 2, 2006, Rita Lucey, R.N., reported that Smith's ICD check was normal. (Tr. at 210-11) Smith told Nurse Lucey that he had no chest discomfort, palpitations, dyspnea, shocks, dizzy spells or lightheadedness, chills or fever. (*Id.* at 210) Nurse Lucey noted that Smith was a carpenter and that his work involved lifting, "so he will need to be out of work for eight weeks secondary to limitations in lifting and arm motion restrictions." (*Id.* at 211) Smith had later follow-up checks of his ICD in 2006, which were normal. (*Id.* at 197, 201)

On February 15, 2006, Smith again saw Dr. Ramos. (Tr. at 207-09) He told Dr. Ramos he had no chest pain, pressure, heaviness, or tightness. (*Id.* at 208) Smith reported that he had lost his job and has been "taking it easy." (*Id.*) Dr. Ramos reported that Smith asked about going back to work. (*Id.*) Dr. Ramos noted that "[f]rom a cardiac standpoint he is actually currently asymptomatic and despite a dilated cardiomyopathy he had no areas of ischemia on a recent stress test. He has had a dilated cardiomyopathy for many years because of recurrent [myocardial infarctions] for which [he] has not followed [*sic*] with therapies. I feel it likely he will be able to return to work but have asked him to call me if he runs into trouble." (*Id.*)

On May 2, 2006, Smith returned to Dr. Ramos. (Tr. at 202) Smith reported that he was able to perform all of his regular activities without difficulty, but did get exertional dyspnea (shortness of breath) when he over exerts himself. (*Id.* at 203) Dr. Ramos noted that Smith intended to lead a Boy Scout troop on a camping trip in August 2006, but did not think he would be able to hike up the mountain, and required a doctor's letter so that he would be permitted to

7

drive instead. (*Id.*) Dr. Ramos agreed that Smith would have difficulty getting up the mountain and wrote a letter to that effect. (*Id.*)

On July 24, 2006, Smith visited Joseph Rubacky, D.O., his primary care physician. (Tr. at 264) He reported to Dr. Rubacky that he gets short of breath in climbing stairs or walking 100 feet, and occasionally feels tightness in his left arm. (*Id.*) Dr. Rubacky's assessment was that Smith had coronary disease with severe ischemic cardiomyopathy symptomatic, hypertension, hyperlipidemia, that he was an active smoker, and that he had glucose intolerance. (*Id.*) Dr. Rubacky's plan was for Smith to continue his medication, to follow up with Dr. Ramos, to discontinue smoking, and to try to lose 20 pounds. (*Id.*)

In August, 2006, Smith alleges that he became disabled. (Tr. at 101, 129)

Smith met again with Dr. Ramos in September 2006, and reported that he was able to perform all of his regular activities without difficulty. (Tr. at 195) Dr. Ramos did note that Smith got short of breath when he "tries to overdue [*sic*] things a bit" and that during the August 2006 camping trip he "did need help to get up the mountain." (*Id.*) Dr. Ramos indicated that he would follow up with Smith in six months, when he would recheck Smith's lab studies and check a stress test and an echocardiogram, with the hope that Smith's LV ejection fraction would climb above 30% since Smith had been at least partially compliant with medication. (*Id.*)

In October through December 2006, Smith saw Dr. Rubacky on a number of different occasions. (Tr. at 261-63) Each time, Smith denied having any chest pain or shortness of breath. (*Id.*) Smith did report pain in his right knee in a November visit, which originated as a result of a moped accident a few months before, and reported a productive purulent cough in a December visit. (*Id.* at 261-62)

8

c.    **2007**

On January 9, 2007, Dr. Rubacky completed a Delaware Health and Social Services

Medical Certification form. (Tr. at 260)  Dr. Rubacky listed Smith's diagnosis as "severe

cardiomyopathy – [status post] defibrillator." (*Id.*)  By checking the appropriate boxes, Dr.

Rubacky indicated that:  (1) Smith was not able to work at his usual occupation; (2) he would not

permit him to perform any other work on a full-time basis; and (3) the estimated duration of

Smith's illness is more than 12 months. (*Id.*)  Finally, Dr. Rubacky noted, in the "remarks"

section: "No work per cardiologist – Dr. Ramos." (*Id.*)

Smith saw Dr. Rubacky again on January 25, 2007, where he reported no chest pain, but

chronic shortness of breath. (Tr. at 258)  Dr. Rubacky noted, "[u]nfortunately, continues to

smoke." (*Id.*)  Smith told Dr. Rubacky he had no dizziness except when coughing. (*Id.*)

On February 28, 2007, Smith underwent a stress test, the results of which indicated no

evidence for exercise induced ischemia, but the presence of a severely dilated left ventricular

cavity with severely reduced left ventricular systolic function and a calculated ejection fraction of

23%. (Tr. at 188-189)  Test results noted that Smith was able to achieve 10 METs (units of

energy expenditure based on oxygen consumption) during the test. (*Id.*); *see also Konya v.*

*Barnhart*, 391 F. Supp. 2d 273, 280 n.1 (D. Del. 2005).

On March 15, 2007, Smith again met with Dr. Ramos, who again reported that Smith was

able to perform all of his regular activities without difficulty and was doing "pretty well from a

cardiac standpoint." (Tr. at 185)  Dr. Ramos also reported that Smith gets short of breath when

he "tries to overdo things[,]" but that this usually resolves with rest. (*Id.* at 186)  Dr. Ramos also

noted that he was "asking him to work harder with diet and exercise," pointing out that "[h]e did

well on his recent stress test. He had good exercise tolerance without chest discomfort, ischemic EKG changes or evidence of ischemia on Cardiolite imaging." (*Id.*) Finally, Dr. Ramos noted that Smith's ejection fraction had improved when compared with the previous study, but was "still severely diminished." (*Id.*)

On May 11, 2007, Smith saw Dr. Rubacky, and reported no chest pain or shortness of breath. (Tr. at 257) Dr. Rubacky cleared Smith to participate in Boy Scout camp "at sedentary level only." (*Id.*)

On May 24, 2007, Smith saw Roger Kerzner, M.D., for a consultation regarding possible upgrade to a bi-ventricular ICD. (Tr. at 337-39) Dr. Kerzner noted that Smith had severe cardiomyopathy and New York Heart Association Class III congestive heart failure ("Class III CHF"). (*Id.* at 338) At this visit, Smith told Dr. Kerzner that he was "quite limited in his activity due to dyspnea" and that "with just walking down his driveway, he has extreme dyspnea that prevents him from going the whole way. If he climbs even just ½ flight of stairs, he is quite exhausted." (*Id.* at 337) Smith also told Dr. Kerzner that he had not been able to work due to his severe limiting heart failure symptoms. (*Id.*) Dr. Kerzner noted that Smith had "severe heart failure," and that he would benefit from an upgrade of his defibrillator to a bi-ventricular ICD, so that he could receive cardiac resynchronization therapy. (*Id.* at 338)

On June 6, 2007, M. H. Borek, M.D., a medical consultant, prepared a Physical Residual Functional Capacity Assessment for Smith. (Tr. at 267-73) Dr. Borek found that Smith could occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, stand or walk for a total of at least 2 hours in an 8-hour work day, sit for a total of about 6 hours in an 8-hour work day, that he had an unlimited ability to push or pull, could occasionally climb ramps or stairs,

10

could balance, stoop, kneel, crouch, or crawl, but could never climb ladders, ropes, or scaffolds. (*Id.* at 267-69) Dr. Borek concluded that Smith had no manipulative, visual, or communicative limitations, but should avoid concentrated exposure to extreme cold or heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, as all could increase cardiac stress. (*Id.* at 269-70) Dr. Borek noted that Smith had conditions that could cause Smith's alleged symptoms and dysfunction, but found that the magnitude of Smith's reported dysfunction (including that Smith was only able to walk 200 feet before resting) was only "partially credible[,]" in light of Smith's February 2007 stress test (in which Smith was able to achieve 10 METs of cardiac work without any ischemia) and Dr. Rubacky's May 2007 clearance of Smith to participate in sedentary activities with the Boy Scouts. (*Id.* at 273) Dr. Borek concluded that Smith's maximum Residual Functional Capacity (or "RFC") was "[s]edentary[.]" (*Id.*) In doing so, he gave "controlling" weight to Dr. Rubacky's treating source opinion in the file (i.e., Dr. Rubacky's May 2007 allowance of sedentary activity), noting this was an appropriate RFC, especially with the "AICD in place," and further noting that Smith had limits for hazards and cardiac stressors.[1] (*Id.*)

On August 1, 2007, Smith's ICD was checked and was normal. (Tr. at 329-30) At that time, Smith reported dizziness when he gets up quickly and chronic dyspnea on exertion. (*Id.* at 329) On September 6, 2007, after a second attempt at a venoplasty was successful (a first

---

[1]    On July 10, 2007, Jose Acuna of the Delaware Division of Vocational Rehabilitation's Disability Determination Services Unit ("DE DDS") affirmed Dr. Borek's conclusions, noting that despite Smith's significantly low LVEF, he was able to achieve 10 METs during his February 2007 stress test and that his defibrillator had not activated during that test. (Tr. at 274) On July 12, 2007, Z. Blum of the DE DDS completed a Case Analysis and affirmed the finding of a sedentary RFC, relying on the fact that Smith had registered 10 METs on the February 2007 stress test in support of that conclusion. (*Id.* at 282)

attempt had failed), Dr. Weiner upgraded Smith's ICD. (*Id.* at 291-96, 325, 341-43, 350) The procedure was successful. (*Id.* at 325)

On September 18, 2007, Smith saw John W. Shuck, M.D., a cardiologist, to have the newly implanted device checked. (Tr. at 325) At this visit, Smith told Dr. Shuck that he had worsening light-headedness and dizziness, indicating that every time he changed positions from sitting to standing or laying to sitting he got light-headed. (*Id.*) Smith denied chest discomfort, but stated that he continued to experience shortness of breath on exertion and had no improvement in his energy level. (*Id.*) The ICD check revealed that Smith was currently "in atrial fibrillation in the 70s at rest," which began the day before his visit. (*Id.* at 326) Dr. Shuck further noted that "[t]he patient continues to exhibit class III heart failure symptoms." (*Id.*)

The visit with Dr. Shuck led to a follow-up visit with Dr. Ramos on September 21, 2007. Dr. Ramos noted that the atrial fibrillation continued despite initiation of amiodarone, antiarrhythmic medication. (Tr. at 322-23) At this visit, Smith denied lightheadedness or dizziness and reported to Dr. Ramos that he could perform most of his usual activities without much difficulty. (*Id.* at 322-23) Smith did complain of fatigue, which Dr. Ramos thought had gotten worse since he went into atrial fibrillation. (*Id.* at 323) Dr. Ramos planned to increase the dose of amiodarone and meet with Smith again in a few weeks. (*Id.*) Smith had a similar visit with Dr. Ramos on October 10, 2007. (*Id.* at 320-321)

On October 22, 2007, Smith met with Dr. Ramos again. (Tr. at 318) Smith continued to complain of fatigue, which he had said was worse with the increased amiodarone, prompting Dr. Ramos to decrease the dose between visits. (*Id.* at 318) An EKG at this visit showed Smith was "back in sinus or atrial paced rhythm." (*Id.* at 319) Dr. Ramos noted that he "anticipate[d]

12

further improvement in [Smith's] energy levels once the amiodarone kicks in and if he remains in sinus rhythm for an extended period." (*Id.*) Dr. Ramos also sent Smith for an ICD check on November 7, 2007, which was normal. (*Id.* at 316-17) During that check up, Smith complained of dizziness and shortness of breath, and it was noted that the "patient thinks he feels worse [with] ICD than he did before." (*Id.* at 316)

On December 10, 2007, Smith saw Roberto Scaffidi, M.D. for a routine visit.[2] (Tr. at 312) Dr. Scaffidi noted that, following Smith's prior complaints of fatigue and shortness of breath, multiple lab studies were ordered to search for a cause. (*Id.*) Smith reported to Dr. Scaffidi that he felt worse since the bi-ventricular ICD was placed and continued to have shortness of breath upon exertion. (*Id.*) He also noted occasional stabbing pain in the left side of his chest, unrelated to exertion, and occasional dizziness when he bent over or stood up rapidly. (*Id.*) Dr. Scaffidi noted that Smith's CBC was normal, as were several other tests. (*Id.* at 313) He further stated "[i]t is unclear at this point whether ongoing ventricular dyssynchronous could be a determining factor to his ongoing dyspnea on exertion. However, he does continue to smoke, and has physical examination signs consistent with chronic frontal pulmonary disease. I suspect that this at least in part is contributing to his overall clinical picture at this time." (*Id.* at 313) Accordingly, Dr. Scaffidi referred Smith to pulmonology for a workup for suspected COPD as a contributing cause of dyspnea. (*Id.* at 314) Dr. Scaffidi further noted: "Strongly encourage patient to discontinue tobacco abuse." (*Id.*)

On December 11, 2007, Smith met with Aditya N. Dubey, M.D., of Kent Pulmonary

---

[2]     Dr. Scaffidi noted that Smith was a previous patient of his partner, Dr. Ramos, but that Smith's case had been "transfer[red] . . . to my care." (Tr. at 312)

Associates. (Tr. at 305) Dr. Dubey noted that Smith complained of dyspnea on exertion, which he said had been ongoing for at least three months. (*Id.*) Smith also complained of a cough and occasional left-sided pain. (*Id.*) Dr. Dubey noted Smith had no history of dizziness or lightheadedness, but that he does complain of excessive daytime sleepiness and noted he will "doze off at inappropriate times." (*Id.*) Dr. Dubey's notes indicate that Smith "works as a carpenter." (*Id.*) Dr. Dubey's diagnosis was chronic obstructive pulmonary disease. (*Id.* at 306) She ordered a further evaluation, started Smith on additional medication and strongly advised him to quit smoking. (*Id.*) She further indicated that Smith's history suggested obstructive sleep apnea and ordered a diagnostic polysomnogram. (*Id.*)

On March 10, 2008, Smith saw Dr. Scaffidi for a follow up visit. (Tr. at 309) Dr. Scaffidi noted that Smith's status was essentially unchanged since the last visit; Smith continued to complain of shortness of breath after limited exertion and of occasional stabbing chest discomfort that resolved on its own. (*Id.*) Smith's pulmonary function testing revealed that his lungs were functioning at 80% capacity. (*Id.*) Dr. Scaffidi noted that Smith was "somewhat limited in his physical activity secondary to his [chronic heart failure] symptoms." (*Id.* at 310) He also noted that "[b]y history, he may very well have obstructive sleep apnea which contributes to his overall symptoms. I suspect that his continued smoking and some degree of COPD are also concerning factors. He does not follow a specific diet and he is clearly overweight, which also puts further strain on his heart and . . . likely contributes to his dyspnea as well." (*Id.*) Dr. Scaffidi adjusted some of Smith's medications, referred him to cardiac rehabilitation to establish an exercise program, instructed him on dietary changes, referred him for a sleep study to assess for sleep apnea, and strongly encouraged him to quit smoking. (*Id.* at 310-11)

On or about April 2, 2008, Dr. Ramos completed a "Physician's Statement" regarding Smith; the statement appears to have been typewritten by another person, and Dr. Ramos made handwritten changes to portions of the statement. (Tr. at 369) Dr. Ramos agreed that he was Smith's treating cardiologist from April 2002 through March 2003, and then again from October 2005 through March 2007. (*Id.*) He agreed that Smith reported fatigue and chest pains when he attempted to work and that he reported shortness of breath going up and down steps. (*Id.*) He stated that Smith's heart condition is so severe that if he were able to improve compliance he would refer him to a tertiary medical center which performs cardiac transplantation. (*Id.*) He noted that Smith's most recent LVEF was 23% and that a normal LVEF is between 50% and 60%. (*Id.*) He agreed that Smith's heart was operating at less than 50% efficiency and that, accordingly, he is subject to chronic fatigue. (*Id.*) Dr. Ramos agreed that, although there has been some slight improvement in Smith's condition recently, the condition of his heart is such that he could not maintain any kind of regular work on a 40-hour a week basis. (*Id.*)

However, Dr. Ramos did not agree with the statement that "[e]ven if [Smith] were to have some kind of sedentary work for which he might be qualified, the normal stress of almost any job would put [Smith] at risk for heart failure," noting instead that such "stress" was for the primary care physician to evaluate. (Tr. at 369) Dr. Ramos agreed that Smith's reports of shortness of breath, heaviness, tightness and chest pain are all consistent with his condition, but did not agree with the statement that "[e]ven normal activities of everyday living would cause cardiac symptoms for Mr. Smith," adding instead that this would only be the case when Smith "doesn't take his meds." (*Id.* at 370) Under the "other comments" section, Dr. Ramos noted "ICD does place limits on certain types of work." (*Id.*)

15

### 2.     The Administrative Hearing

#### a.     Mr. Smith's Testimony

At his administrative hearing, Smith testified that he lived with his wife and stepson, who was then fifteen years old. (Tr. at 38) He said that since he began working he has held positions as a carpenter, a well-driller, an employee at medical supply companies, a maintenance supervisor in a nursing home, and a handyman. (*Id.* at 27) The last time he was regularly employed was in August 2005, at which time he was fired from his job at the nursing home. (*Id.* at 28) Smith testified that he became disabled and that his health "starting going down" when "they started putting machines in [him]." (*Id.*)

Smith said that in January of 2006 he received a defibrillator because his doctors did not know when his heart might stop. (Tr. at 29) Though it never "went off," Smith testified that it did not help his condition; instead, his condition got worse. (*Id.* at 30). He "was getting a lot weaker, more tired." (*Id.*) Smith said he tried to do some work after that—including installing a small floor for his neighbors—and it took him days to do what should have only taken hours. (*Id.*) At that point, Smith said he "knew that things [weren't] going right." (*Id.*)

Smith said he next contacted vocational rehabilitation personnel, to see if he could find work, but they were only able to help him find part-time work, which was sporadic. (Tr. at 30-31) He testified that he did not think he could do any kind of job on a regular 40-hour a week basis, because he could barely walk around Wal-Mart without getting tired and having to sit down and because carrying things "would take [his] wind away." (*Id.* at 31) He said that climbing one flight of steps makes him feel "like I'm going to collapse" and that walking to the end of the driveway with his trash can that is on wheels leaves him "totally wore out." (*Id.*)

16

Smith testified that his major problem is that he is tired but that he also gets short of breath, sometimes even when he is not doing anything. (*Id*. at 31-32)

Smith stated that he does help around the house. He said that he and his wife take turns cooking and he does laundry occasionally. (Tr. at 32) He would do some vacuuming, but he can not do the whole house at one time. (*Id*.) He can cut the grass on the riding mower, but that "wears [him] out too, because it's not power steering." (*Id*.) He cannot trim the grass, as "[t]he weed whacker is just too much." (*Id*.) Smith testified that when he does do any of these activities, he has to rest when he is done. (*Id*. at 32-33)

With regard to his daily routine, Smith testified that he usually makes coffee upon getting up, then smokes a cigarette, drinks his coffee and takes a shower. (Tr. at 33) After that, he might run an errand, such as go to a store, as he did on the morning of the hearing. (*Id*.) When he gets home, he is "beat." (*Id*.) If he tried to do any activities around the house, such as painting or repairs, he testified that it would "take a lot out of" him. (*Id*. at 34) In particular, he noted that he gets dizzy and feels like he is going to pass out when he bends over, which happens several times a day. (*Id*.)

In the afternoons, Smith testified that he used to sit in his chair and do small crafts with his hands, but he had to stop because his hands cramp up and go to sleep. (Tr. at 34) He said that he is not able to sit in his chair for extended periods of time because he "get[s] squirmy" and has to get up because of his hips. (*Id*. at 34-35)

Smith testified that he falls asleep randomly throughout the day. (Tr. at 35) He cannot sit through a movie without falling asleep and when he does fall asleep, he may stay asleep anywhere from five minutes to half an hour. (*Id*.) Smith testified that he was diagnosed with

17

sleep apnea just two weeks before the hearing, for which he uses a CPAP machine, but that it does not help. (*Id.* at 36, 42)  Smith stated he gets short of breath every day, sometimes even when just sitting still. (*Id.* at 36-37)

Smith testified that he can read and write, but has difficulty spelling and understanding things. (Tr. at 36)  He needed his wife's help to fill out the Social Security application. (*Id.*)

Upon questioning from the ALJ, Smith testified that he can lift about 50 pounds, but that his doctor says he should not lift more than 20 pounds. (Tr. at 40)  He then stated that carrying a gallon of milk from the car to the kitchen "wears [him] out." (*Id.*)  Smith testified that he can only stand for about five minutes, and then his legs start aching and he has to move around. (*Id.*)  He does not know what is wrong with his legs but said that his muscles tighten and he gets leg cramps. (*Id.*)  He admitted he has not received treatment from a doctor for his legs and has never injured them. (*Id.*)  Smith testified that he can only walk about 100 feet before getting tired and could probably go up to 250 feet before he would have to sit down. (*Id.* at 41)  He said he can only sit for about 15 or 20 minutes before his lower back starts to bother him, though he admitted there is nothing wrong with his back. (*Id.*)  He further testified that, once this happens, if he stands up and twists his body, then he can sit back down and be "okay for another short period." (*Id.* at 41-42)

Smith said he did not believe he had any lung problems, as his "lung test" showed that his lungs "were working at 80%." (Tr. at 42)  He testified that his shortness of breath is due to his heart, not his lungs. (*Id.*)  He does have chest pain occasionally but has never had to take Nitroglycerin pills. (*Id.* at 43)

Smith confirmed that he has had four heart attacks, the last one of which was ten years

18

prior to the hearing. (Tr. at 43)  The only surgery he has had was to implant a defibrillator and pacemaker. (*Id.* at 43-44)

Smith acknowledged that his doctors suggested that he should not be smoking, but noted that he was down to half or one pack a day from the four packs a day he used to smoke. (Tr. at 33)  He testified that he has been smoking for approximately 38 years. (*Id.*)

### b.    Mrs. Smith's Testimony

Mr. Smith's wife, Catherine Smith, testified next. (Tr. at 47)  She testified that she has been a registered nurse for 23 years, mostly working in hospices, nursing homes and most recently at a psychiatric center. (*Id.* at 48)

Mrs. Smith testified that her husband suffers from cardiomyopathy, which she explained is "when the heart muscle is dying" and that "part of the heart . . . is actually dead and does not beat effectively." (Tr. at 48)  Mrs. Smith said prior to the time that her husband had a pacemaker and defibrillator put in, she had begun to see a decline in the things that he was able to do, such as the ability to go for walks around the neighborhood. (*Id.* at 49)

Mr. Smith's attorney asked Mrs. Smith about her husband's ejection fraction.  He first asked her "what the ejection rate is supposed to be" to which she responded that "between 50 and 60 is what would be normal." (Tr. at 50)  The attorney next asked "what effect does that have on you when the ejection rate is low?" (*Id.*)  Mrs. Smith answered that "[t]he heart is not beating effectively.  The blood is not getting to where it needs to go. . . ." (*Id.*)  Smith's attorney then asked if the below normal ejection fraction would make a person tired, to which Mrs. Smith answered yes, explaining that "[w]hen you have a poor ejection fraction . . . if the oxygen isn't getting to the brain the brain starts to shut down.  The body wants to rest and he falls asleep."

(*Id.*) Smith's attorney then asked Mrs. Smith if she was familiar with the "METs" referenced in Smith's stress test; she testified that she was not, noting that she "didn't focus on cardiology." (*Id.* at 50-51)

Smith's attorney asked Mrs. Smith about her husband's activities. She testified that he attempts to do yard work "which might last for half-an-hour and then he's got to sit down." (Tr. at 51) She said that "turning of the wheel" of the riding lawn mower is "stressful." (*Id.*) Mrs. Smith testified that, though her husband dresses himself, "he is very short of breath after he's done" and "[t]aking a shower he's short of breath." (*Id.* at 52) She said he falls asleep when they watch the news in the morning. (*Id.*) He might walk down to the mailbox and "putter in the backyard . . . [b]ut he comes in and he sits down and he falls asleep." (*Id.*) In the evening, Mrs. Smith testified, they watch television "and it might be five minutes into the show and he's asleep." (*Id.*) She said her husband has no problem sleeping at night. (*Id.*) When he falls asleep during the day, Mrs. Smith said he will sleep for anywhere between half-an-hour to an hour, depending on if she wakes him up. (*Id.* at 52-53)

Mrs. Smith testified that when Smith tries to help out with things like vacuuming "he'll do one room" and be very short of breath. (Tr. at 53) She said that he is sometimes short of breath even when he is sitting at rest. (*Id.*) She further testified that his respiratory rate, while resting, is "twice as fast" as hers. (*Id.*)

Smith's attorney next asked Mrs. Smith about her husband's activities before his health declined. (Tr. at 53) She agreed that he did "a lot of carpentry type work and did work at places," and was "an active person." (*Id.*) When asked if she thought he could do any kind of job where he had to show up at work 40 hours a week, Mrs. Smith answered "[i]f he could sleep

20

on the job." (*Id.* at 53-54)  If he could not sleep on the job, Mrs. Smith's answer was no, "because first of all, he's very fatigued very quickly" and "[e]ven walking from not even 100 feet, he gets very fatigued, very short of breath." (*Id.* at 54)  She added that "when he stands up from places at times, a lot of times he's dizzy.  He gets numbness in his hands a lot. . . . And to sit sedentary he would fall asleep." (*Id.*)

The attorney asked Mrs. Smith if her husband has any problem with memory. (Tr. at 54) She said that he did and gave examples, such as when she will tell him things and then later have to remind him about what she said. (*Id.* at 54-55)

The ALJ asked Mrs. Smith a few questions. (Tr. at 55)  He asked her whether she thought Smith fell asleep while watching television because of his heart, or because of his sleep apnea; Mrs. Smith replied that she thought it was a combination of both. (*Id.* at 56-57)  She testified that she does not know how well the CPAP machine is working for his sleep apnea because she does not sleep with him often, noting that "he doesn't sleep very well at times." (*Id.*)

### c.    The Vocational Expert's Testimony

Vocational expert Diana Simms also testified at the hearing. (Tr. at 57)  She stated that Smith's work as a director of maintenance for the nursing home was skilled and heavy in exertion, which would be a Skilled Vocational Preparation ("SVP") Level 7. (*Id.* at 59)  His prior work as a driver delivering medical supplies was a medium exertion job, with an SVP of 3. (*Id.*)  His prior work as a maintenance supervisor, similar to his role as director of maintenance, was heavy in exertion and had an SVP of 7. (*Id.* at 59-60).  Smith's prior work as a "warehouse person" and "driver" were jobs that are heavy in exertion, with an SVP of 3, and his prior work as a well driller carried an SVP of 4. (*Id.* at 60)  His work as a handyman was heavy in exertion

21

with an SVP of 7. (*Id.*) Simms testified that the only transferable skill in the previous jobs

would be light driving. (*Id.*)

The ALJ asked Simms the following hypothetical question:

> Assume a person [of Smith's age, education level, and work
> history], suffering mainly and generally from cardio mypoathy with
> the latest ejection fraction . . . of 23 percent . . . If I find a person
> can lift . . . 10 pounds occasionally and lesser amounts frequently
> and can even lift 10 pounds frequently and 20 on occasion, and sit
> for 30 minutes, stand for 10 minutes consistently on an alternate
> basis during an eight-hour day, five days a week, but would have to
> avoid heights and hazardous machinery due to his dizziness he
> sometimes has. Avoid prolonged climbing, balancing, stooping,
> no more than one or twice an hour. Avoid temperature and
> humidity extremes, probably odors, gases, fumes and like
> substances, chemicals. Little reading and writing ability due to his
> educational background, but he seems to be able to read and write
> but not on an efficient basis. He would need simple, routine,
> unskilled jobs, of course. Low stress, low concentration due to his
> fatigue. He seems to be able to attend tasks and complete
> schedules and with those limitations be able to do sedentary, light
> work activities. Would there be jobs such a person can do, in your
> opinion, with those limitations in significant numbers in the
> national economy?

(Tr. at 61-62) Simms answered "yes." (*Id.* at 62) She further testified that, at the sedentary

exertional level, there would be "bench work" jobs as a "checker," (approximately 500 jobs

available in the region[3] and 150,000 in the national economy), or as a "bench worker"

(approximately 500 jobs available in the region and 190,000 in the national economy); that at the

light exertional level there would be jobs as a "bench assembler" (approximately 900 jobs

available in the region and 180,000 in the national economy) or a "hand finisher" (approximately

450 jobs available in the region and 150,000 in the national economy). (*Id.* at 62-63) The ALJ

---

[3]        The "region" is approximately a 75-mile radius from Dover, Delaware. (Tr. at 64)

asked Simms if these jobs would allow a person to sit and stand on an alternate basis, to which

Simms testified that they would, although she noted that the Dictionary of Occupational Titles

(the "DOT") does not use the "sit/stand" terminology. (*Id.* at 63-64) Simms further testified that

she did not believe Smith could perform his previous work. (*Id.* at 64)

Smith's attorney was then provided with an opportunity to question Simms. (Tr. at 64)

The attorney asked Simms whether she would agree that there would be no jobs available for

Smith if she assumed Smith's testimony was credible. (*Id.* at 65) Simms said she would agree

that "based on the testimony that he provided in regard to his shortness of breath, his fatigue [,

she] would definitely agree." (*Id.*) The attorney next asked if Simms agreed that "if someone, on

an unscheduled basis, tends to fall asleep on the job, that person could not hold a competitive

job." (*Id.*) Simms again agreed. (*Id.*) The ALJ asked Simms whether the person could sleep a

little bit on the jobs Simms had referenced; Simms responded that one could during lunchtime.

(*Id.*)

Smith's attorney next asked Simms if she was familiar with the "New York Association

heart classifications," to which Simms responded "I've seen them." (Tr. at 65) Smith's attorney

indicated that there is a reference in the medical records to a "Class 3" classification, and asked

Simms whether she was familiar with it, to which she responded she was. (*Id.*) The attorney

represented that Class 3 patients have "cardiac disease resulting in marked limitation of physical

activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation,

dyspnea or anginal pain." (*Id.* at 65-66) He then asked Simms, "[a]ssuming that this medical

information is correct, that Mr. Smith is a Class 3 patient, how would that impact on his ability to

work?" (*Id.* at 66) Simms responded "I would indicate that such a person in that category would

not be able to do [substantial gainful activity ("SGA")]." (*Id.*)

In response, the ALJ noted that he and the VE were "still confronted" with the "METs ten" classification reported on Smith's February 2007 stress test. (Tr. at 66)  The ALJ noted that he "know[s] what [this classification] means" and he had "seen it many, many times and [knows] what exertional level it is classified by the . . . Department of Labor." (*Id.*)

### 3.    The ALJ's Findings

On June 10, 2008, the ALJ issued the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since August 25, 2006, the alleged onset date (20 C.F.R. 404.1520(b) and 404.1571 *et seq.*).

3. The claimant has the following severe impairments: coronary artery disease, congestive heart failure, cardiomyopathy status post embolic myocardial infarctions and defibrillator placement, chronic obstructive pulmonary disease, and obesity[4] (20 C.F.R. 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that he can sit for only 30 minutes at a time and stand for ten minutes, must avoid exposure to heights and hazards due to dizziness, no prolonged climbing, balancing, or stooping, no concentrated exposure to humidity or temperature extremes, or odors, gases, chemicals or similar substances due to his COPD, and is further limited to simple, routine jobs requiring little reading or writing, and jobs with low stress and requiring low concentration due to fatigue.

---

[4]      The ALJ found that Smith's diagnosis with obstructive sleep apnea and hyperlipidemia did not amount to severe impairments under the law. (Tr. at 13)

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7. The claimant was born on August 6, 1959 and was 47 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 C.F.R. 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See [Social Security Ruling ("SSR")] 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 25, 2006 through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. at 10-20)

### 4.   Mr. Smith's Second Disability Application

Following the issuance of the ALJ's June 10, 2008 decision, Smith filed a second disability application. On October 8, 2009, ALJ Joseph F. Leary ("ALJ Leary") issued a decision finding that Smith was disabled under sections 216(i) and 223(d) of the Social Security Act since June 11, 2008.  (D.I. 14, ex. A)[5]

ALJ Leary found that Smith had the following severe impairments:  non-ischemic

---

[5]      As ALJ Leary noted, Social Security regulations limited the potential disability period for this subsequent application to no earlier than "the first day following the previously adjudicated period, i.e., the period through the date of the ALJ or Appeals Council decision being reviewed by the court." (D.I. 14, Ex. A at 7)

cardiomyopathy, chronic obstructive pulmonary disease, obstructive sleep apnea, and obesity.

(*Id.* at 10) Further, ALJ Leary found that Smith's impairments medically equaled "the criteria of

section 3.02 and 4.02 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d),

404.1525 and 404.1526)." (D.I. 14, Ex. A at 10)

## II.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56. In determining the appropriateness of summary judgment, the Court must "review

the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party' but

not weighing the evidence or making credibility determinations." *Hill v. City of Scranton*, 411

F.3d 118, 124-25 (3d Cir. 2005) (alterations in original) (quoting *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B.   Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000). "Substantial evidence" means less than a preponderance of the evidence but

more than a mere scintilla of evidence. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir.

2005). The United States Supreme Court has explained that substantial evidence "does not mean

a large or considerable amount of evidence, but rather such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552,

564-65 (1988) (internal quotation marks and citation omitted).  The United States Court of Appeals for the Third Circuit has also held that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).  "Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Id.* (citation omitted).

In analyzing whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).  The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001).  Thus, the Court's inquiry is not whether the Court would have made the same determination as the Commissioner; instead, the question is whether the Commissioner's conclusion is reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).  Even if the reviewing court would have decided the case differently, it must defer to the ALJ and affirm the commissioner's decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190–91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision for the purpose of determining whether the correct legal standards were applied. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000).  The Court's review of legal issues is plenary. *Id.*

## III.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1), "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from a

physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  In order to qualify

for DIB, the claimant must establish that she was disabled prior to the date she was last insured.

20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).  A "disability" is

defined as the "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A).  A claimant is disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); *Barnhart v.*

*Thomas*, 540 U.S. 20, 21–22 (2003).

To determine whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis.  20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422,

428 (3d Cir. 1999).  If a finding of disability or non-disability can be made at any point in the

sequential process, the Commissioner will not review the claim further.  *See* 20 C.F.R. §

404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in

substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of nondisability

28

when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, then the Commissioner proceeds to step three, and must compare the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listings, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either by itself or in combination, fails to meet or medically equal any listing, the Commissioner should proceed to steps four and five. 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Johnson v. Comm'r of Social Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal quotations and citations omitted). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428 (citation omitted).

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when

the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is

on the Commissioner to show that the claimant is capable of performing other available work

before denying disability benefits. *Id.* In other words, the ALJ must show that "there are other

jobs existing in significant numbers in the national economy which the claimant can perform,

consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.*

When making this determination, the ALJ must analyze the cumulative effect of all of the

claimant's impairments. *Id.* At this step, the ALJ often seeks the assistance of a vocational

expert. *Id.* (citation omitted).

### B.   Mr. Smith's Arguments On Appeal

On appeal, Smith presents three sets of arguments, and asserts that: (1) in various ways,

the ALJ improperly assessed the medical evidence; (2) the ALJ failed to properly weigh the

testimony of Mrs. Smith; and (3) the ALJ's RFC finding is inconsistent with the nature of the

jobs upon which he relied to find that Smith could perform substantial gainful activity. (D.I. 13

at 2-3) The Court considers each set of arguments in turn.

#### 1.   The ALJ's Assessment of the Medical Evidence

##### a.   The ALJ's Consideration of Opinions of Mr. Smith's Treating Physicians and of a State Agency Physician

Smith first argues that the ALJ failed to follow the "treating physician doctrine" in not

giving sufficient weight to the opinions of six doctors who treated Smith and by failing to

properly credit certain aspects of those physicians' opinions. (D.I. 13 at 8-18) Relatedly, Smith

alleges that the ALJ also erred in assigning more weight to the opinion of the state agency

physician than the treating physician opinions. (*Id.*)

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord

treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer,* 186 F.3d at 429); *see also Dougherty v. Astrue,* 715 F. Supp. 2d 572, 580 (D. Del. 2010). The applicable Social Security regulations instruct that:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . .

20 C.F.R. § 404.1527(c)(2); *see also Fargnoli v. Massanari,* 247 F.3d at 34, 43 (3d Cir. 2001).

These regulations instruct that if a treating source's opinion as to the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." 20 C.F.R. § 404.1527(c)(2); *see also* SSR 96-2p, 61 Fed. Reg. 34490-01 (July 2, 1996). After undertaking this analysis, if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he or she must then determine what weight to give the opinion. The ALJ must do so by considering the following factors: length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, the degree to which the physician presents relevant medical evidence in support of the opinion, the consistency of the opinion with the record as a whole, the degree to which the opinion relates to an area in which the physician specializes, and any other factors "which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(2)-(6); *Ongay v. Astrue,* Civil No. 09-0610 RMB, 2010 WL 5463070, at *9 (D. Del. Dec. 29, 2010).

31

"Where a treating physician's medical opinion conflicts with [that of] a non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Ongay*, 2010 WL 5463070, at *10 (quoting *Morales*, 225 F.3d at 317). An ALJ may reject a treating physician's opinion as long as the rejection is due to contradictory medical evidence, rather than the ALJ's "own credibility judgments, speculation, or lay opinion." *Morales*, 225 F.3d at 317 (citation omitted).

Here, the ALJ specifically addressed the opinions of three medical sources: (1) Dr. Rubacky, Smith's family physician; (2) Dr. Ramos, Smith's cardiologist; and (3) Dr. Borek, a state agency physician.[6] (Tr. at 17-18) In examining Dr. Rubacky's and Dr. Ramos' opinions regarding Smith's ability to work, the ALJ accurately set out the appropriate legal standards, discussed above, regarding how to assess a treating physician's opinion. (*Id*.) Ultimately, the ALJ did not give controlling weight to either treating physician's opinion, finding that both were inconsistent with the record evidence, but did give the opinion of the state agency physician, Dr. Borek, "significant weight." (*Id*. at 18) For the reasons that follow, the Court finds that the ALJ's approach to these opinions did not constitute reversible error.

### i.    Dr. Rubacky's and Dr. Ramos' Opinions

Dr. Rubacky completed a single page Medical Certification form at the request of Delaware Health and Social Services in January 2007, in order to assist the agency in evaluating

---

[6]     While Smith argues that there are "six" treating physician opinions in the record, the Court finds that the four "opinions" not addressed by the ALJ—those of Doctors Kerzner, Parikh, Scaffidi, and Shuck—were not, in fact, opinions regarding Smith's ability to work. Rather, as Smith acknowledges, these doctors simply made statements in their treatment notes that Smith had been diagnosed with Class III CHF, and about his symptoms. (D.I. 13 at 9-11) The significance of this diagnosis is addressed separately below.

Smith's request for benefits. (Tr. at 260) Dr. Rubacky checked boxes indicating that Smith was

unable to work at his usual occupation, that he would not permit Smith to perform any other

work on a full time basis, and added, in the "Remarks" section: "No work per cardiologist – Dr.

Ramos." (*Id.*) The ALJ assigned "some weight" to Dr. Rubacky's opinion that Smith could not

perform his usual job, but did not give controlling weight, or any significant weight, to the

portions of Dr. Rubacky's opinion indicating that Smith could not maintain any job on a full

time, 40-hour-a-week basis.[7] (*Id.* at 18) In coming to this conclusion, the ALJ noted that Dr.

Rubacky's opinion was "not supported by his own treatment records and is inconsistent with the

lack of work restrictions in his contemporaneous notes and his advice that [Smith] could attend

Boy Scout camp and do sedentary activities." (*Id.*) The Court finds that the ALJ's conclusion is

supported by substantial evidence.

For one thing, Dr. Rubacky's treatment notes do not indicate that Smith experienced

significant heart-related physical limitations in this time period, let alone limitations that would

impact Smith's work ability in the way Dr. Rubacky suggested. Dr. Rubacky prepared the form

on January 9, 2007, after at least four visits with Smith in 2006. (Tr. at 260)  Though Smith did

complain in a July 2006 visit of becoming winded after climbing stairs or walking 100 feet, (*id.*

at 264), during a number of other visits with Dr. Rubacky later in 2006, Smith repeatedly denied

---

[7] Dr. Rubacky's opinion had only one area in which Smith's limitations or
complaints (or any type of medical history) was referred to—the "Major Complaint" section, in
which Dr. Rubacky wrote "[d]ifficulty breathing [and] bending over or exertion [and] short of
breath at test." (Tr. at 260) As the Commissioner notes, the ALJ restricted Smith to sedentary
work in a manner that appears to have considered and taken into account these complaints, in
that, *inter alia*, the restrictions limited the amount of time Smith can sit or stand on the job,
mandated that Smith avoid stooping, and required a job with low stress and low concentration.
(D.I. 16 at 21-22)

the existence of chest pain, dizziness, weakness, shortness of breath and heart palpitations.[8]  (Id.

at 261-64)  And at no time during the period before he issued his opinion did Dr. Rubacky place

any limitations on Smith's ability to work, nor even on the extent of Smith's physical activities.

Moreover, even in the months following Dr. Rubacky's report, although Smith

complained of shortness of breath and occasional dizziness on one follow-up visit, (Tr. at 258),

by May 2007 (as the ALJ noted), Dr. Rubacky cleared Smith for "sedentary level" participation

in Boy Scout activities.  (Id. at 257; see also id. at 18)  This came after Smith once again reported

no dizziness, chest pain or shortness of breath.  (Id. at 257)  Otherwise, Dr. Rubacky's treatment

plan in this time period consisted simply of repeated direction to Smith to discontinue smoking,

continue his medications, and return to the office as needed.  (Id.)

With respect to Dr. Ramos, on or about April 2, 2008, he marked up and signed a

"Physician's Statement."[9]  (Tr. at 369)  In that statement, Dr. Ramos agreed that: (1) Smith

reports fatigue and chest pains when he has attempted to work; (2) Smith reports shortness of

breath going up and down steps; (3) Smith's heart condition was so severe that if Smith

improved compliance he would refer him to a tertiary medical center which performs cardiac

transplantation; and (4) Smith's heart is operating at less than 50% efficiency and, accordingly,

he is subject to chronic fatigue.  (Id.)  Dr. Ramos thereafter agreed that, although there had been

some slight improvement in Smith's condition recently, the condition of his heart is such that he

---

[8]      Indeed, one of these visits appears to have been occasioned by the fact that Smith
had been using a moped, and fell off of it, injuring his leg. (Tr. at 262)

[9]      As previously noted, this statement appears to have been drafted by another for
Dr. Ramos' review; it does not cite to any particular medical record generated by Dr. Ramos.
(Tr. at 369)

could not "maintain any kind of regular work on a 40-hour a week basis." (*Id.*)

The ALJ did not afford Dr. Ramos' opinion controlling weight, and instead appeared to give it little or no weight, concluding that Dr. Ramos' "treatment records do not support the conclusion that [Smith] cannot work a 40-hour week" as "there is no indication in his notes that the claimant was limited to that degree." (Tr. at 18)  In support, the ALJ pointed to Dr. Ramos' statements in 2006 and 2007 to the effect that Smith could try to return to work, could lead his Boy Scouts troop's camping trip, and should exercise more. (*Id.*)  The ALJ also noted that "Dr. Ramos' records are . . . replete with references to the claimant's non-compliance with treatment, particularly his continued tobacco use." (*Id.*)  Again, after careful review, the Court finds that the ALJ's decision in this regard is supported by substantial evidence.

Though Smith began seeing Dr. Ramos as far back as 2002, he was non-compliant with follow-up visits and medication from March 2003 until October 2005. (Tr. at 225, 369)  Shortly after he was laid off, Smith resumed visits with Dr. Ramos's office. (*Id.* at 225)  However, during these visits in 2006, while Smith reported some shortness of breath, he reported no chest pain, lightheadedness, or dizziness. (*Id.* at 194, 203, 208)  As a result, in 2006, Dr. Ramos repeatedly noted that Smith was able to perform all of his regular activities without difficulty. (*Id.* at 195, 203)  In February 2006, Dr. Ramos reported that he felt it "likely [Smith] will be able to return to work"; later in the year, Dr. Ramos reported that Smith had gone on a Boy Scout camping trip in August 2006, where he was able to walk "up [a] mountain" with help.[10] (*Id.* at 195, 203)

---

[10]     Dr. Ramos did advise Smith to refrain from working for the eight weeks following the implantation of his defibrillator, but by February 2006, Dr. Ramos cleared Smith to return to work, noting that he was "asymptomatic" from a cardiac standpoint. (Tr. at 208)

35

The medical evidence was not dissimilar in 2007 and 2008.  In March 2007, Dr. Ramos again noted Smith could perform all of his regular activities without much difficulty and that he was doing "pretty well from a cardiac standpoint." (Tr. at 185)  In response to Smith's complaints regarding shortness of breath, Dr. Ramos noted that this occurs when Smith "overdo[es] things a bit" and resolves with rest. (*Id.* at 186)  Finding that Smith "did well on a recent stress test" and that he "had good exercise tolerance without chest discomfort," Dr. Ramos anticipated that Smith would feel better as he got "*more* active in the nicer weather" and recommended that Smith "work harder" with diet and exercise. (*Id.* (emphasis added))  From September through October of 2007, as Smith prepared for an upgrade of his defibrillator, Dr. Ramos reported that Smith complained of increasing fatigue and had gone into atrial fibrillation. (*Id.* at 319, 321-22)  Yet Dr. Ramos again noted in these visits that Smith could perform most of his usual activities without too much difficulty, and, after Smith's heart had returned to a normal rhythm, Dr. Ramos stated "I anticipate further improvement in his energy levels once the [medication] kicks in. . . ." (*Id.* at 319, 321, 323)  By April 2008, when Dr. Ramos completed his report (at a time when he was no longer seeing Smith as a patient), although Smith continued to complain to doctors of shortness of breath on exertion and occasional chest discomfort, physicians described him as only "somewhat limited in his physical activity" and had referred him to an exercise program. (*Id.* at 310)  Throughout these time periods, Dr. Ramos placed no real limitation on Smith's activities.

Taking the entirety of this record into account, the ALJ's decision not to afford controlling weight to Dr. Ramos' opinion (and indeed, to afford it little weight) is supported by substantial evidence.  That record can reasonably support a conclusion that, from 2006 through

the time of Dr. Ramos' report in early 2008, Dr. Ramos (and other physicians) had not depicted

Smith as someone who could not "maintain any kind of regular work on a 40-hour a week

basis"—but instead had described Smith as someone who was not significantly limited in his

physical abilities.

To be sure, as Smith points out, the Third Circuit has cautioned that courts should take

care to note the "'distinction between a doctor's notes for the purposes of treatment and that

doctor's ultimate opinion on the claimant's ability to work.'" (D.I. 13 at 15 (quoting *Brownawell*

*v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008))) Smith suggests that the ALJ blurred

this distinction and cited to portions of Dr. Ramos' records in a way that painted Smith's physical

and cardiac functionality in an inappropriately robust light. (D.I. 13 at 15) However, the Third

Circuit has also repeatedly held that when a treating physician's notes, analyzed as a whole,

contradict the physician's opinion on a claimant's ability to work, an ALJ may properly rely on

those notes in determining that the opinion is entitled to little or no weight. *See, e.g., Dula v.*

*Barnhart*, 129 F. App'x 715, 719 (3d. Cir. 2005); *Humphreys v. Barnhart*, 127 F. App'x 73, 76

(3d Cir. 2005); *see also Shelton v. Astrue,* Civil Action No. 11-75J, 2012 WL 3715561, at *3

(W.D. Pa. Aug. 28, 2012); *Petrowsky v. Astrue*, No. Civ. 10-563-SLR, 2011 WL 6083117, at

*14-15 (D. Del. Dec. 6, 2011). In light of the medical record set out above, there is substantial

evidence to support the ALJ's conclusion that this is an example of the latter scenario.

Ultimately, the ALJ's treatment of both Dr. Rubacky's opinion and Dr. Ramos' opinion

was consistent with the law regarding the treating physician doctrine. The ALJ credibly found

that there was a lack of relevant medical evidence presented in support of these physicians'

opinions, and that the opinions were not consistent with the record as a whole. In such

circumstances, it was not improper for the ALJ to give the opinions less than controlling weight, and indeed, little weight, in the disability calculus. *See Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) ("In light of . . . conflicting and internally contradictory evidence, the ALJ correctly determined that the opinions of [claimant's] treating physicians were not controlling.") (citation omitted); *Harris v. Astrue*, 886 F. Supp. 2d 416, 423-24 (D. Del. 2012) (finding that ALJ "set forth legally sufficient reasons to afford little weight to [treating physician's] statement that [claimant] was disabled" as that opinion was "inconsistent with" the evidence in the record, including the physician's own treatment notes); *Freels v. Astrue*, 772 F. Supp. 2d 608, 623-24 (D. Del. 2011) (upholding ALJ's opinion that treating physician's conclusions were not supported by medical record and should receive "little weight," where ALJ provided sufficient reasons for the determination and where those conclusions were inconsistent with the physician's own notes).

### ii.    The State Agency Physician's Opinion

In addition to his argument that the ALJ gave too little weight to the treating physicians' opinions, Smith also argues that the ALJ improperly gave too much weight to the June 2007 opinion of the state agency physician, Dr. Borek. (D.I. 13 at 13) In that opinion, Dr. Borek concluded, *inter alia*, that Smith had conditions that could cause some of his alleged symptoms and dysfunction, but that the *magnitude* of Smith's reported dysfunction (including that he was only able to walk 200 feet without resting) was only "partially credible." (Tr. at 272-273) In support, Dr. Borek noted that in Smith's February 2007 stress test, Smith was able to achieve 10 METs of cardiac work without any ischemia, and also cited Dr. Rubacky's May 2007 clearance of Smith to participate in sedentary activities with the Boy Scouts. (*Id.* at 273) Ultimately, Dr.

Borek concluded that Smith's maximum RFC was sedentary, further noting that Smith has limits

for hazards and cardiac stressors. (*Id.*)

The ALJ afforded "significant weight" to Dr. Borek's opinion. (Tr. at 18)  In doing so,

the ALJ noted that the opinion was consistent with the medical evidence "including the

claimant's ability to perform at a 10-MET level on the stress test, his continued participation in

Boy Scout activities, his reported ability to walk a mile on a level surface, and the lack of

restrictions in his physicians' treatment records." (*Id.*)  Smith objects to the ALJ's reliance on

Dr. Borek's opinion, primarily due to the fact that it was rendered in mid-2007, "long before the

record was complete" and before "documentation of [Smith's] Class III congestive heart failure

was added [to the record] . . . before Dr. Ramos provided his assessment . . . [and] before [Smith

underwent a second procedure to implant] a new pace-making defibrillator . . . [that] worsen[ed]

his symptoms." (D.I. 13 at 13-14)

It can be inappropriate for an ALJ to rely on a medical opinion that was issued prior to the

close of the period of claimed disability, particularly if a claimant's medical condition changes

significantly after the opinion is issued. *See, e.g., Alley v. Astrue*, 862 F. Supp. 2d 352, 366 (D.

Del. 2012); *Morris v. Astrue*, Civ. Action No. 10-414-LPS-CJB, 2012 WL 769479, at *24 (Mar.

9, 2012).  However, when a state agency physician renders an RFC assessment prior to a hearing,

the ALJ may rely on the RFC if it is supported by the record as a whole, including evidence that

accrued after the assessment. *See, e.g., Pollace v. Astrue*, Civil Action No. 06-05156, 2008 WL

370590, at *6 (E.D. Pa. Feb. 6, 2008); *see also Johnson v. Comm'r of Soc. Sec.*, Civil No. 11-

1268 (JRT/SER), 2012 WL 4328389, at *9 n.13 (D. Minn. Sept. 20, 2012); *Tyree v. Astrue*, No.

3:09–1091, 2010 WL 2650315, at *4 (M.D. Tenn. June 28, 2010).[11]

Here, Dr. Borek's report was issued in June 2007—after approximately half of the claimed two-year period of disability (spanning August 2006 through June 2008) now at issue had passed (and five months *after* Dr. Rubacky's opinion—on which Smith relies upon heavily—was issued).[12] Most importantly, none of the events that occurred between June 2007 and June 2008 would be likely to have altered Dr. Borek's conclusions. Dr. Borek's assessment cited to and hinged upon Smith's own treating physicians' medical records, to the extent those records commented on Smith's physical abilities. None of Smith's doctors who treated him in late 2007 and early 2008 (after the issuance of Dr. Borek's opinion)—even those who noted the Class III CHF diagnosis and observed worsening symptoms following the upgraded ICD—recommended that Smith limit his physical activity. Instead, as noted above, those physicians continued to report that Smith could perform most of his usual activities without much difficulty, and were suggesting that Smith increase his physical activity in this time period.

Accordingly, under these circumstances, it was not inappropriate for the ALJ to rely on Dr. Borek's opinion and accord it substantial weight, despite the issuance date of that opinion. *See Johnson*, 2012 WL 4328389, at *9 (noting that "the mere fact that the state physicians' RFC assessments were written two years before the hearing date does not necessarily render them unworthy of credence[,]" especially where those opinions were consistent with subsequent

---

[11]    Indeed, even in the absence of a supporting opinion from a state agency physician, the ALJ may draw conclusions different from those put forward by the treating physician, so long as those conclusions are consistent with the medical record and the treating physician's conclusions are not supported by the record. *Freels*, 772 F. Supp. 2d at 623.

[12]    The report also appears to have been issued after the physician conducted an in-person evaluation of Smith. (Tr. at 273)

records); *Hall v. Astrue*, No. 1:09 CV 2514, 2010 WL 5621291, at *8 (N.D. Ohio Dec. 23, 2010)

(finding ALJ's reliance on state agency physician opinions issued a year and a half before the

hearing was not in error, where the opinions were probative of claimant's impairments after the

alleged onset date).

### b.     The ALJ's Duty to Develop the Record

Smith next argues that the ALJ had a duty to obtain a clarifying medical expert ("ME")

opinion as to the significance of Smith's diagnosis of Class III CHF, before concluding that

Smith did not meet or equal a cardiac listing. (D.I. 13 at 15) "It is the ALJ's duty to investigate

the facts and develop the arguments both for and against granting benefits[,]" *Sims v. Apfel*, 530

U.S. 103, 111 (2000), though the burden to provide evidence of an impairment or the severity of

that impairment remains on Plaintiff, *see Bell v. Barnhart*, 218 F. Supp. 2d 583, 593 (D. Del.

2002). The ALJ's duty includes an obligation to further develop a record that reveals evidentiary

gaps resulting in prejudice to the claimant, or where the medical records at issue contain a

conflict or ambiguity that must be resolved. *Id.* Absent such circumstances, further development

of the record is not required. *Id.*

Smith makes two primary arguments as to why the ALJ's duty to further develop the

record was clear, which the Court will consider in turn.

### i.     The ALJ's Alleged Failure to Understand Mr. Smith's Impairments

First, Smith cites to a portion of the hearing transcript to argue that the ALJ did not

"understand the nature of Mr. Smith's impairments" and, thus, that the ALJ required further

assistance from an ME. (D.I. 13 at 16) At the hearing, the ALJ referenced the results of Smith's

February 2007 stress test, in which Smith achieved a result of 10 METs, and said that he intended

to get "clarification as to what ten METs means in regard to [Smith's] ejection fraction of 23 percent" noting that "to me they're inconclusive and incomprehensible." (Tr. at 60; *see also* D.I. 13 at 15)

However, to the extent that Smith argues that this indicates that the ALJ did not understand what the reference to performing at a "10 MET" level during a stress test means, the remainder of the hearing transcript confirms this is not so. Later in the hearing, in response to Smith's attorney's comment that "we meet the listings even if we don't know what METS 10 means[,]" the ALJ stated "[w]e know what it means, but it's not in the file. I've seen it many, many times and I know what exertional level it is classified by the . . . Department of Labor." (Tr. at 66) Indeed, reference to MET levels are not uncommon in such cases. *See Macera v. Barnhart*, 305 F. Supp. 2d 410, 415 n.2 (D. Del. 2004) ("The ability to exercise to 10 METS is considered to be consistent with the capacity to perform activities like shoveling 16 pound loads for 10 minutes at a time, running at a pace of 6 miles per hour, ski touring at 5 or more miles per hour in loose snow and playing competitive squash and handball.") (citation omitted). As further evidence of this, Dr. Borek referred to Smith's ability to perform to a 10 MET level on the stress test as a key factor in his medical opinion as to Smith's RFC, a point that the ALJ cited in his decision. (Tr. at 18, 273)

All of this suggests that the ALJ's reference to getting "clarification" did not point to an evidentiary gap in the record, nor was it an indication that the ALJ was confused by the terminology used in the report of Smith's stress test. Rather, it suggests that the ALJ was simply trying to process how those results should best be reconciled with other aspects of the medical record, such as Smith's low ejection fraction. As noted above, medical evidence in the record

(including reports from Dr. Ramos) indicated that Smith's physicians had previously considered this same question, and had repeatedly noted that despite his low ejection fraction, Smith could perform his regular activities. In light of this, further development of that record was not required.

### ii.   Impact of ALJ Leary's Decision

Second, Smith argues that the need for further record development is evident by the fact that ALJ Leary (the ALJ who considered Smith's second disability application) later concluded that Smith's condition did, in fact, meet certain listings. (D.I. 13 at 16) Smith notes that in coming to this conclusion, ALJ Leary obtained and reviewed August 2009 interrogatory responses from Dr. John Menio; in Smith's view, ALJ Leary's conclusion demonstrates that had ALJ Benitz (hereinafter also referred to as "the first ALJ") similarly obtained more information about Smith's condition, such additional evidence would have altered the outcome. (*Id.* at 16-17)

More specifically, Smith appears to argue that further development of the record would have demonstrated that, contrary to the first ALJ's conclusion, he met or equaled Listing 4.02, chronic heart failure.[13] (D.I. 13 at 16) To satisfy this listing, a claimant must have both: (1) one of the medically documented symptoms listed in Listing 4.02(A); and (2) those symptoms must result in one of the types of outcomes listed in Listing 4.02(B). Here, there is no dispute that

---

[13]     The ALJ also considered whether Smith met the requirements of Listing 4.04, ischemic heart disease, and concluded that he did not. (Tr. at 14) Smith does not appear to contest that conclusion. (D.I. 13 at 16) Smith's opening brief could be read to suggest that Listing 3.02, chronic pulmonary insufficiency, should have also been considered by the first ALJ, (D.I. 13 at 16), but it does not appear that Smith ever raised the applicability of this listing. (*See* Tr. at 14, 24 (referring only to Listings 4.02 and 4.04))

Smith met the requirements of Listing 4.02(A), which he satisfied because he has a severely

dilated left ventricular cavity, as well as severely reduced systolic function and a calculated

ejection fraction of less than 30%. (Tr. at 14)  Instead, the question before the ALJ was whether

Smith also met the requirements of 4.02(B), which provide that the claimant's symptoms must

result in one of the following:

1.  Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2.  Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3.  Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a.  Dyspnea, fatigue, palpitations, or chest discomfort; or

b.  Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c.  Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

44

> d.   Signs attributable to inadequate cerebral perfusion,
>       such as ataxic gait or mental confusion.

20 C.F.R. Pt. 404, Subpt. P, App. 1, at 4.02(B). The first ALJ found that Smith did not meet this

Listing because "although the claimant has persistent fatigue and shortness of breath which may

limit his activities, he was given a stress test by his cardiologist [in 2005 and 2007] and

performed quite well." (Tr. at 14) The first ALJ concluded that "[t]he claimant was able to

exercise to a level twice what would be required to meet listing 4.02B3. . . ." (*Id.*)

The Court disagrees that ALJ Leary's conclusion (or the manner in which it was reached)

demonstrates that the first ALJ erred in failing to sufficiently develop the record. The Court

reaches this conclusion for two primary reasons.

First, ALJ Leary was considering a different claim for a different time period than was the

first ALJ. As ALJ Leary noted, Social Security regulations prohibited him from considering the

question of whether Smith was disabled during the period of time considered by the first ALJ and

now under review by this Court. (D.I. 14, ex. A at 7)  Instead, ALJ Leary only considered

whether Smith's condition had become disabling since the day following the period closed to re-

adjudication—a period beginning on June 11, 2008. (*Id.*)

Second, and relatedly, ALJ Leary based his decision on evidence that was gathered *after*

the first ALJ made his decision in June 2008—evidence that appears to relate to the status of

Smith's impairments *after* the first hearing. Though the actual evidence presented to ALJ Leary

is not in the record before this Court, in his decision, ALJ Leary did specifically reference Dr.

Menio's August 2009 interrogatory responses. Those responses included Dr. Menio's conclusion

that "the claimant's condition equaled a combination of Listing . . . 4.02, specifically 4.02A1B3a,

due to cardiomyopathy with an ejection fraction of fifteen percent, exertional dyspnea, and

45

fatigue . . . ." (D.I. 14, ex. A at 10)

As noted above, in order to meet the requirements of subsection B(3)(a) of Listing 4.02, a claimant must be *unable to perform on an exercise tolerance test at a workload equivalent of 5 METs or less* due to dyspnea, fatigue, palpitations or chest discomfort. ALJ Leary's decision does not specifically address how the evidence before him (including Dr. Menio's interrogatory responses) demonstrated that Smith would not have been able to perform on a stress test at a workload of 5 METs or less. But, by comparison, the record before the first ALJ contained the results from Smith's last stress test in February 2007—at test in which, as the first ALJ noted in his decision, Smith "exercised for eight minutes, reaching a workload of 10 METS . . . [which] was considered a 'negative treadmill stress test for exercised-induced ischemia at an adequate level of exercise.'" (Tr. at 14; *see also* Tr. at 188-89) Smith does not explain why it was error for the first ALJ to consider the results of this most recent stress test, which appeared to establish that Smith *could* tolerate exercise at a workload equivalent of well above 5 METs, in concluding that subsection B(3)(a) of Listing 4.02 had not been met. Nor does Smith explain how the rationale behind Dr. Menio's August 2009 interrogatory responses compels a different conclusion, or suggests that the ALJ should have further developed the record before him in some way.

Moreover, the record that ALJ Leary relied upon in making his finding appears to contain other evidence that could not have been before the first ALJ. For example, ALJ Leary's decision notes that important to Dr. Menio's conclusion was the fact that Smith now had an ejection fraction of 15%—one lower than Smith's reported 23% ejection fraction at the time of the hearing before the first ALJ. (D.I. 14, ex. A at 10) Additionally, in concluding that Listing 4.02

46

was met, ALJ Leary stated that Dr. Menio "focused" on a May 28, 2009 report of Dr. Scaffidi (a report that could not have been before the first ALJ at the time of his June 2008 decision), in which Dr. Scaffidi concluded that, *inter alia*, "claimant could not lift over 10 pounds and could not do any lifting on a regular basis." (*Id.*) These new developments appear to suggest that Smith's condition continued to deteriorate from the time of the first ALJ's decision in June 2008 through ALJ Leary's decision in October 2009. On their face, however, they do not demonstrate why the record before the first ALJ *in June 2008* required further development.

For these reasons, ALJ Leary's later decision that Smith met certain listings, including Listing 4.02, does not convince the Court that further development of the record regarding Smith's first application was warranted, or would have resulted in a different outcome.

c. **Whether the Evidence Before ALJ Leary Constitutes "New" and "Material" Evidence Pursuant to 42 U.S.C. § 405(g)**

Smith next makes another argument regarding ALJ Leary's decision: that it constitutes "new and material evidence of Mr. Smith's disability [that] require[s] remand under Sentence Six of 42 U.S.C. § 405(g)." (D.I. 13 at 16) Sentence six of 42 U.S.C. § 405(g) provides that "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." *See also Szubak v. Sec'y of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984) (noting that Section 405(g) requires that such evidence be new, material and that good cause be established for failing to incorporate the evidence into the record). For a number of reasons, the Court finds that the requirements of this portion of Section 405(g) have not been met.

First, Smith has not actually submitted the bulk of this assertedly new, material evidence to the Court. To the extent that Smith identifies the "new" evidence on which he bases this argument, he cites to (1) ALJ Leary's decision; (2) Dr. Menio's interrogatories; and (3) Dr. Scaffidi's report. Yet he has not made Dr. Menio's interrogatories or Dr. Scaffidi's report a part of the record here, leaving the Court without the ability to review that evidence or to fully determine how its contents relate to the criteria set out in Section 405(g).[14] *See Beaty v. Comm'r of Soc. Sec.*, No. 1:10-cv-894, 2012 WL 3779700, at *7 (W.D. Mich. Aug. 3, 2012) (where claimant received subsequent favorable decision and requested Section 405(g) remand regarding initial application, court denied request, *inter alia*, because claimant failed to submit to the Court certain records that had been heavily relied upon by the subsequent decision awarding benefits).

Second, as discussed above, ALJ Leary's decision on the second application appears to be primarily based on evidence that was developed during (and that pertains to) a later period in time than that relevant to the first ALJ's decision. Dr. Menio's interrogatories are dated August 27, 2009, more than 14 months after the first ALJ's decision, and Dr. Scaffidi's report is dated May 28, 2009, almost 12 months after the first decision. To the extent that these physicians rely on events that occurred after the date of the first ALJ's decision in coming to their conclusions,

---

[14]     As to ALJ Leary's decision, it is far from clear that the decision itself (divorced from any of the underlying medical evidence that it relies upon), could be the kind of new, material evidence that sentence six of Section 405(g) refers to. *See, e.g., Allen v. Comm'r*, 561 F.3d 646, 653 (6th Cir. 2009) (finding that a subsequent favorable ALJ decision, separated from any new substantive evidence supporting the decision, could not itself be "new evidence" under sentence six of Section 405(g)); *Perry v. Astrue*, Civil Action No. 10-11004-DPW, 2012 WL 645890, at *12 (D. Mass. Feb. 27, 2012) (noting that majority of courts have considered the issue have followed *Allen*'s reasoning). Regardless, ALJ Leary's decision as to this issue relies exclusively on Dr. Menio's and Dr. Scaffidi's opinions, (D.I. 14, ex. A at 10), and thus it is clear that it is the weight of those opinions that are the gravamen of Smith's Section 405(g) argument here.

such evidence would not be material to whether Smith was disabled prior to the first hearing. *Kendall v. Astrue*, Civ. No. 05-698-LPS, 2008 WL 557965, at *12, 19 (D. Del. Feb. 28, 2008) (rejecting claimant's argument that decision to award benefits on her second application shows that she should have been awarded benefits on her initial application, where second favorable decision relied on evidence regarding claimant's status of impairments *after* the initial denial); *Shuter v. Astrue*, 537 F. Supp. 2d 752, 757 n.4 (E.D. Pa. 2008) (same); *see also Szubak*, 745 F.2d at 833 ("An implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition.") (citation omitted). Alternatively, even if some portion of the content of these opinions *does* rely on data available at the time of the first hearing, Smith has not demonstrated (nor even attempted to demonstrate) good cause for the failure to produce such opinions in the first proceeding. *See Shuter*, 537 F. Supp. 2d at 757 n.4 ("As a practical matter, it would be counterproductive and against the purpose of § 405(g) to allow a plaintiff whose claim was denied by an ALJ to seek a secondary opinion or diagnosis from another doctor and then to label the opinion 'new evidence' entitling the plaintiff to a remand."); *see also Dieter v. Astrue*, Civil Action No. 11-2023, 2012 WL 1231821, at *5 (E.D. Pa. Mar. 21, 2012) (finding that plaintiff had failed to demonstrate good cause pursuant to Section 405(g) for why physician opinion submitted to Appeals Council could not have been submitted to ALJ).

For these reasons, the Court finds that the above-referenced medical evidence considered by ALJ Leary as to Smith's second disability application does not require remand pursuant to sentence six of Section 405(g).

### d.   Mr. Smith's Diagnosis of Class III Congestive Heart Failure

Smith also contends that the ALJ "completely failed to assess the significance" of his diagnosis of Class III CHF, or consider the fact that Ms. Simms, the VE, testified that a person with Class III CHF could not sustain regular work. (D.I. 13 at 12-13)  Smith argues that this amounted to legal error. (*Id.*)

Third Circuit law provides that a finding of disability cannot be based solely on the existence of a specific diagnosis. *Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808, (3d Cir. 2009) ("A diagnosis alone . . . does not demonstrate disability"); *see also Lopez v. Astrue*, Civil Action No. 08-1871, 2009 WL 2950799, at *2 n.4 (E.D. Pa. Sept. 3, 2009) (same).  Rather, a claimant is required to show that his diagnosis "significantly limit[s] his physical or mental ability to do basic work activities." *Foley*, 349 F. App'x at 808 (citing 20 C.F.R. §§ 404.1520(c), 404.1521(a)).

Here, as the ALJ noted in his decision, the record contains substantial evidence to support a finding that Smith was not so limited by his congestive heart failure.  (Tr. at 16-17 (noting that after this diagnosis in 2007, "[t]here is no indication that the claimant was advised to limit his activities in any way" and that "[t]o the contrary, he was referred for cardiac rehabilitation to establish an exercise program and increase his exercise tolerance."))  The record can support the conclusion that Smith exceeded expectations when it came to performance, in spite of the presence of a condition that is frequently associated with a limited physical capacity.  As previously noted, Smith's doctors repeatedly referenced his good results on his February 2007 stress test, registered their surprise at his functionality, and recommended, in light of his unexpected tolerance for exercise, that he actually increase his exercise activity.  These facts are

sufficient to support the ALJ's conclusion that Smith's Class III CHF diagnosis did not

"significantly limit[] his physical or mental ability to do basic work activities."

For similar reasons, the ALJ was not required to accept the VE's testimony, in response

to a question by Smith's attorney, that someone with Smith's diagnosis of Class III CHF would

not, in all cases, be able to perform substantial gainful activity.[15]   (Tr. at 65-66)  The law is clear

that an ALJ has authority to disregard a VE's response to a hypothetical that is inconsistent with

the evidence in the record.  *See, e.g., Jones v. Barnhart*, 364 F.3d 501, 506 (3d Cir. 2004).  Here,

Smith interprets the import of the VE's testimony to be that a person with the described diagnosis

of Class III CHF could never perform substantial gainful activity—no matter what other evidence

of record there was about that person's abilities.  Yet, as noted above, there is substantial

evidence in the record to support the ALJ's conclusion that, in this particular case, such a finding

was not warranted.  Indeed, after the VE provided the response at issue at the hearing, the ALJ

immediately interjected by noting "[w]e're still confronted with METS ten"—in essence,

reminding Smith's attorney and the VE that *in Smith's case*, the actual results of his February

2007 stress test suggested that Smith's Class III CHF condition was not as limiting as it might be

to *other* claimants in *other* cases.  (Tr. at 66)  *Cf. Neal v. Colvin*, Civil Action No. H-12-1255,

2013 WL 2431973, at *1, 5, 7, 9, 15 (S.D. Tex. June 4, 2013) (finding no legal error in ALJ's

decision to deny benefits to claimant diagnosed with conditions including Class III CHF, when

---

[15]       The VE was asked by Smith's attorney: "[a]nd it says here that patients with [Class III CHF have] marked limitation of physical ability.  They are comfortable at rest.  Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain.  Assuming that this medical information is correct, that Mr. Smith is a Class 3 patient, how would that impact his ability to work?"  (Tr. at 65-66)  The VE responded "I would indicate that such a person in that category would not be able to do [substantial gainful activity]."  (*Id.* at 66)

record otherwise supported decision); *Jones v. Astrue*, No. 4:12-cv-11-AGF-SPM, 2013 WL

1090357, at *8-9, 18 (E.D. Mo. Feb. 28, 2013) (same).[16]

2.    **The ALJ's Failure to Discuss Mrs. Smith's Testimony**

Smith next asserts that the ALJ was obligated to, and failed to, assess the credibility of

Mrs. Smith and assign weight to her testimony. (D.I. 13 at 18-21)  An ALJ must consider and

weigh all of the non-medical evidence before him, including testimony from family members of a

claimant. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000) (citing *Van*

*Horn v. Schweiker*, 717 F. 2d 871, 873 (3d Cir. 1983) (additional citation omitted)).  In doing so,

to the extent the ALJ rejects this testimony, the ALJ must explain why he did so. *Burnett*, 220

F.3d at 122.

---

[16]    Smith also asserts that the ALJ committed legal error in "not inquir[ing] into the work restrictions necessitated by defibrillator implantation"—but does so in a single sentence in his briefing, with no further explanation made regarding this argument in other parts of his briefs. (D.I. 13 at 17; D.I. 17 at 4)  In light of Smith's failure to articulate his argument in this regard, the Court finds that the argument has been waived, and will not further address it. *See Conroy v. Leone*, 316 F. App'x 140, 144 n.5 (3d Cir. 2009); *Berrocal v. Astrue*, Civil Action No. 2:10-cv-02226, 2011 WL 890150, at *3 (D.N.J. Mar. 14, 2011). Additionally, in a footnote, Smith makes a similarly brief argument that the ALJ erred in determining that Smith's sleep apnea was a non-severe impairment. (D.I. 13 at 18-19 n.7) Even to the extent that this argument is not waived, it is Smith's burden to produce medical evidence establishing the existence of an impairment, its severity and how it affects his functioning. 20 C.F.R. § 404.1512(c). Here, Smith points to no opinion from a treating medical source documenting functional limitations caused by this condition, and neither Dr. Rubacky nor Dr. Ramos referenced sleep apnea as being the cause of Smith's limitations in their respective medical opinions. (Tr. at 260, 369-70) In such a circumstance, substantial evidence supports the ALJ's decision that there "is no evidence that [this] impairment[] impose[s] any significant restrictions on [Smith's] ability to perform basic work activities, and . . . that [it is] not severe." (Tr. at 13); *see also Hamblin v. Astrue*, No. 8:11-CV-1645-T-TGW, 2012 WL 3670226, at *5-6 (M.D. Fla. Aug. 24, 2012) (where record revealed no indication that physician had rendered opinion that sleep apnea affected claimant's RFC or contributed to functional limitations, substantial evidence supported ALJ's conclusion that claimant's sleep apnea was a non-severe impairment); *Garza v. Astrue*, No. 1:11-cv-0625 LJO BAM, 2012 WL 2499947, at *6-7 (E.D. Cal. June 27, 2012) (same).

Mrs. Smith testified about her personal observations of her husband's condition, and also gave her opinion, based on her experience as a registered nurse, as to how her husband's limitations related to his cardiac condition. In his decision, after summarizing Smith's testimony, the ALJ also summarized Mrs. Smith's testimony. (Tr. at 15)  Immediately thereafter, the ALJ went on to explain that he found Smith's "statements concerning the intensity, persistence and limiting effects of these symptoms [to be] not credible to the extent they are inconsistent with the [ALJ's RFC] assessment," in light of the medical evidence of record and Smith's "diminished" credibility due to his non-compliance with medical treatment over the years. (*Id.* at 16)  In setting out this conclusion regarding Smith's testimony and credibility, the ALJ went on to cite portions of the medical record, but did not mention Mrs. Smith's testimony again. (*Id.* at 16-17)

Plaintiff is correct that the ALJ failed to explicitly assess the credibility of Mrs. Smith's testimony or assign her testimony a particular amount of weight.  However, a fair reading of the ALJ's decision suggests that the ALJ did implicitly make these judgments.  Mrs. Smith's personal observations of her husband's health were, to a great degree, largely repetitive of Smith's testimony on that subject.  As the Commissioner argues, (D.I. 16 at 28-29), the wording and order of the ALJ's decision provides strong indication that (because of the similarity between Mrs. Smith's personal observations of her husband's health and Smith's own testimony on these points) when the ALJ found that Smith's testimony was not credible, the ALJ was also making the same finding as to Mrs. Smith's testimony. *See Kinsey v. Astrue*, Civil Action No. 11-301-RGA, 2012 WL 2879015, at *6 (D. Del. July 13, 2012) ("The Court finds that the ALJ's credibility assessment of Plaintiff, in the paragraph immediately following the ALJ's description of [Plaintiff's husband's] testimony, reflects the ALJ's overall determination of Plaintiff's

credibility as informed by [Plaintiff's husband's] testimony.").

The ALJ's failure to *explicitly* state that he was discounting Mrs. Smith's testimony (and explain why he was doing so) was error. *Burnett*, 220 F.3d at 122; *Terrey v. Astrue*, Civil Action No. 06-1959, 2007 WL 1237936, at *4 (E.D. Pa. Apr. 25, 2007). However, the Court finds that any such error is harmless and would not have changed the outcome of the case. *See Rutherford*, 399 F.3d at 553 (remand not required in Social Security disability case if it would not affect the outcome of the case). Smith's hearing testimony[17]—and Mrs. Smith's similar

---

[17]     In a footnote, Smith argues that the ALJ's weighing of Smith's credibility was legally flawed for three reasons, (D.I. 13 at 19 n.8), none of which the Court finds constitute reversible error. First, Smith contends that the ALJ "did not discuss the specific credibility factors identified in 20 C.F.R. § 404.1529(c)(3)." (D.I. 13 at 19 n.8) However, the ALJ specifically evaluated Smith's complaints regarding his symptoms, and in doing so, did take into account each of the factors set out in Section 1529(c)(3). (Tr. at 15-17) The ALJ concluded that Smith's statements were not credible to the extent that they were inconsistent with treatment notes and Smith's own activities and testimony, (*id.*), a finding that, on this record, is "supported by substantial evidence as required." *Konya*, 391 F. Supp. 2d at 286-87 (rejecting plaintiff's argument that the ALJ erred in failing to adequately consider all of the factors under 20 C.F.R. § 404.1529(c)(3) where the ALJ specifically evaluated plaintiff's complaints of pain and other symptoms and found that objective medical evidence of record clearly contradicted those symptoms). Second, Smith argues that the ALJ "improperly relied on intermittent activities, which did not establish the ability to sustain work." (D.I. 13 at 19 n.8) However, as Defendant points out, (D.I. 16 at 31), the ALJ did not simply examine sporadic activities that Smith engaged in, but also focused on Smith's consistent ability to perform day-to-day "regular activities without difficulty," and focused on Smith's medical records over the entire period of disability at issue. *See Zuckschwerdt v. Comm'r of Soc. Sec.*, No. 07-11084, 2008 WL 795772, at *6 (E.D. Mich. Mar. 25, 2008) (rejecting plaintiff's argument that his ability to perform intermittent activities should not be used to discredit his testimony, where the ALJ supported her credibility determination with ample record evidence, noted plaintiff's "*regular* (as opposed to intermittent) activities," and found that plaintiff's allegations of disability were not supported by his medical records). Third, Smith contends that the ALJ "relied heavily on Mr. Smith's inability to stop smoking as an issue of non-compliance without following the regulatory requirements for assessing non-compliance" or weighing certain facts relating to Smith's smoking habit. (D.I. 13 at 19 n.8 (citing SSR 82-59)). However, Smith's citation to SSR 82-59 here is misplaced, as the Third Circuit has held that this regulation applies to claimants who would otherwise be found to be under disability and for whom treatment is expected to restore the ability to work. *See Vega v. Comm'r of Soc. Sec.*, 358 F. App'x 372, 375 (3d Cir. 2009); *Thomas v. Barnhart*, No. Civ. A.

testimony—suggested that the fatigue and shortness of breath brought on by Smith's heart

condition were so severe that they would preclude Smith from doing even the type of sedentary

work discussed in the ALJ's decision. However, the ALJ was entitled to find those statements

not credible, so long as there is substantial evidence in the record to support such a finding. *Van

Horn*, 717 F. 2d at 873.[18] As previously noted, such evidence exists here. In light of that

evidence, even had the ALJ made explicit what is implicit in his decision—that he treated Mrs.

Smith's testimony similarly to that of Smith on these issues—that would not have required

remand. *See, e.g., Terrey*, 2007 WL 1237936, at *4 (finding ALJ's failure to discuss claimant's

wife's credibility and failure to mention the testimony of another witness to be harmless error,

where it was obvious that, to the extent that the ALJ discounted the credibility of these witnesses,

---

02-2958, 2003 WL 21419154, at *5 (E.D. Pa. June 11, 2003). That is not the case here, as the
ALJ's basis for the denial of benefits was not Smith's noncompliance with medical treatment,
but rather his residual functional capacity to return to sedentary work. (*See* Tr. at 14) An ALJ
may treat a claimant's noncompliance with a treatment plan as a factor in analyzing the
*credibility* of the claimant's testimony, as the ALJ has done here. *Vega*, 2003 WL 21419154, at
*5 (citing SSR 96-7p); *cf. Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205, at *3
(N.D. Tex. Mar. 25, 2011) ("Because the ALJ considered plaintiff's failure to take prescribed
medications only in assessing her credibility, and not in determining whether she would be able
to work had she followed her medication regime, the judge was not required to follow the
procedures set forth in . . . SSR 82-59.").

[18]     It is worth noting that even Smith's and Mrs. Smith's testimony in this regard was
not all one-sided. Both Smith and his wife testified that Smith could perform a number of
exertional activities, such as lifting weight, doing housework (like laundry, vacuuming, or
cooking) and doing outdoor activities (such as riding a lawn mower, or working in the yard). (Tr.
at 32, 40, 51) To be sure, the testimony was that these activities, particularly if they lasted for a
lengthy period of time, eventually caused Smith to be sincerely fatigued and short of breath. But
the type of sedentary work that the ALJ found Smith could perform was meant to take into
account Smith's issues with fatigue, (*id.* at 18), and the ALJ's decision acknowledged that Smith
had such symptoms (*id.* at 16). This is all to say that the ALJ's decision here was nuanced—he
was not determining that *all aspects* of Smith's (and Mrs. Smith's) testimony lacked credibility,
only that their testimony about certain facts—the "intensity, persistence and limiting effects of
these symptoms"—were not credible. (*Id.*)

she did so for the same reasons that she discounted the claimant's own testimony, in light of the objective medical evidence, as any "further discussion of the credibility of these two witnesses would not have changed the outcome of the case"); *Cramer v. Astrue*, Civil Action No. 10-125E, 2011 WL 4472847, at *8 (W.D. Pa. Sept. 26, 2011) ("ALJ . . . was not required to specifically discuss each letter from . . . non-medical sources [including Plaintiff's ex-wife and girlfriend, as] . . . such evidence was cumulative of plaintiffs testimony which was rejected on the basis of lack of credibility and no doubt would have been rejected for the same reason. . . . Remand would not have changed the outcome."); *see also Kinsey*, 2012 WL 2879015, at *6.

But Smith also argues that the ALJ was obligated to consider Mrs. Smith's testimony setting out her opinion as to how Smith's functional limitations related to his heart condition. (D.I. 13 at 19) For example, Smith points out in his opening brief that "Mrs. Smith explained that her husband's heart muscle is dying and does not beat effectively . . . and that his chronic fatigue, drowsiness, and mental lapses are associated with his low ejection fraction because a low distribution of oxygen not only makes the muscles tired, but also limits brain activity." (*Id.* at 18) Smith asserts that it was "particularly egregious" for the ALJ not to explicitly consider Mrs. Smith's testimony—in that she was not only Smith's wife but "also understands [his] limitations because she is a registered nurse[.]" (*Id.* at 20) For support, Smith cites to SSR 06-3p. This ruling, *inter alia*, provides that opinions from "[m]edical sources . . . such as nurse practitioners" are "important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-3p, 2006 WL 2329939 (Aug. 9,

2006) at *2-3.[19]

To the extent that Smith argues that his wife's occupation as nurse required that her testimony be treated as that of a "medical source" pursuant to SSR 06-3p, and carry greater significance than a lay opinion, his argument is misplaced. The courts have found that if evidence comes from a source who is a nurse by profession, but who has not seen or examined the claimant in her professional capacity, the source should not be considered a "medical source" pursuant to SSR 06-3p. *See Spicer v. Astrue*, Civil Action No. 1:08CV357-SRW, 2010 WL 4176313, at *2 n.2 (M.D. Ala. Oct. 18, 2010) ("Although Ellis is a nurse, plaintiff was not her patient. Ellis is not a 'medical source' for purposes of plaintiff's claim for benefits, and she did not see plaintiff in her professional capacity as a nurse. Rather, their relationship was that of supervisor and employee.").

Moreover, even if Mrs. Smith's testimony was viewed as coming from a "medical source" (here, a nurse practitioner) pursuant to SSR 06-3p, the ALJ was not required to credit Mrs. Smith's medical opinions. (D.I. 13 at 20) While SSR 06-3p does provide that evidence from various sources (including a "medical source" such as a nurse) should be considered in the manner described above, it also expressly states that "[i]nformation from these 'other sources'

---

[19]     SSR 06-03p also states that evidence put forward from "other sources," including non-medical sources such as "[s]pouses," should be considered by an ALJ, as such sources "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." 2006 WL 2329939, at *2. The Court has already addressed the extent to which Mrs. Smith's testimony was otherwise explicitly considered by the ALJ (it was not), whether this amounted to legal error (it did) and whether this error was harmless (it was). Therefore, the Court here examines only the issue as to what *additional* effect, if any, Mrs. Smith's testimony should have had on the ALJ's decision, in light of (1) her occupation as a nurse and (2) her statements suggesting that certain medical conditions were the cause of Smith's symptoms.

cannot establish the existence of a medically determinable impairment" and that "there must be evidence from an 'acceptable medical source' for this purpose." SSR 06-3p, 2006 WL 2329939 at *2. Instead, the ruling provides that "only 'acceptable medical sources' can give . . . medical opinions." *Id.* Nurses are not included in the list of "acceptable medical sources" set forth therein. *Id.* (defining "acceptable medical sources" as including certain physicians, psychologists, optometrists, podiatrists and qualified speech-language pathologists).

Therefore, even if Mrs. Smith's testimony was considered that of a "medical source," the ALJ was not required to credit her medical opinions—such as her view as to the reason why Smith's heart did not beat effectively or that his symptoms were associated with his low ejection fraction—nor discuss them in his decision. *See Daniello v. Colvin*, Civ. No. 12-1023-GMS-MPT, 2013 WL 2405442, at *19 (D. Del. June 3, 2013) (finding that ALJ was justified in affording findings of nurse practitioner little weight because, pursuant to SSR 06-3p, a nurse practitioner is considered a "medical source" who is not an "acceptable medical source" and only evidence from "acceptable medical source[s]" can establish the existence of a medically determinable impairment); *Saucedo v. Astrue*, Civil No. 10-253 (RBK), 2011 WL 3651790, at *10-11 (D. Del. Aug. 19, 2011) (same in regard to practical registered nurse).[20] While Mrs. Smith's nursing background may have impacted her testimony about her husband's medical condition, it does not have the effect of converting the testimony into medical opinion evidence.

For these reasons, the Court concludes there was no reversible error in the ALJ's

---

[20]     *See also Wilson v. Astrue*, No. CV-10-1643-PHX-SMM, 2012 WL 2873591, at *3 (D. Ariz. July 9, 2012) (finding that, pursuant to SSR 06-3p, a nurse and social worker could not provide medical opinions as to nature of claimant's disability, nor could those opinions be used to establish a medically determinable impairment).

treatment of Mrs. Smith's testimony.

### 3.    The Vocational Expert's Testimony

Smith's final argument is that "neither of the jobs upon which [the ALJ's] decision relies

meet the criteria of his RFC finding." (D.I. 13 at 22)  As noted above, the ALJ concluded that

Smith's RFC limited him to sedentary work of an unskilled nature with an option to alternate

between sitting and standing. (Tr. at 14)  In his decision, the ALJ relied on the VE's testimony

regarding the availability of "representative occupations such as bench work checker . . . and

bench worker" to conclude that the claimant was capable of adjusting to other work available in

significant numbers in the national economy. (Tr. at 19-20)  The ALJ noted that "[p]ursuant to

SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the

Dictionary of Occupational Titles." (Tr. at 19)

Smith contends that there is only one job titled "bench worker" in the DOT (which, he

notes, requires semi-skilled work), and that there is no job titled "bench work checker." (D.I. 13

at 21 (citing DICOT 616.485-010, 1991 WL 685069 (bench worker)))  He also asserts that

searches in the DOT for jobs including the key words "bench," "work," and "checker" in their

descriptions turn up only jobs that require more than unskilled, sedentary work. (*Id.* at 21-22)

Smith then argues that because neither of the jobs on which the ALJ's decision relied meets the

criteria of the ALJ's RFC finding, the ALJ was required by SSR 00-4p to resolve such a conflict

at the hearing, and that his failure to do so constitutes reversible error. (*Id.* at 22)

With respect to this final issue, the Court cannot identify substantial evidence in the

record to support the ALJ's decision that there are jobs that exist in significant numbers in the

national economy that the claimant can perform.  For multiple reasons, the Court finds that the

VE's testimony appears inconsistent with the DOT and with the ALJ's decision, and that the case must be remanded to clearly resolve this issue.

First, considering the limitations in Smith's RFC, the record does not provide clear support for the conclusion that Smith could perform the particular jobs identified by the VE (and relied upon by the ALJ). At the hearing, when asked by the ALJ if jobs existed in the national economy that a person with Smith's RFC could perform, the VE identified only two positions that required sedentary work and that otherwise assertedly matched Smith's limitations (as set out in a hypothetical posed by the ALJ to the VE).[21] These job positions were "bench work as a checker" and "bench worker[.]" (Tr. at 62-63) In his decision, in determining that there were in fact jobs in the national economy that Smith could perform within the confines of his RFC, the ALJ cited exclusively to the VE's testimony. (*Id.* at 19)

Yet as Smith notes (and the Commissioner does not really dispute), there is no job entitled "bench work checker" in the DOT, and the only job position entitled "bench worker" in the DOT is beyond Smith's exertional level and skill level (requiring light, semi-skilled work). (D.I. 13 at 21-22) For its part, the Court has had difficulty locating any other job positions in the DOT that utilize the titles "bench worker," "bench checker," "checker," or "bench work checker" and that would otherwise clearly match with the requirements in Smith's RFC. On its face then, it appears that in determining that Smith was not disabled, the ALJ (and the VE) relied on Smith's ability to perform two particular jobs, but there is not substantial evidence in the record

---

[21]     The hypothetical included a reference to the possibility that the person at issue could do either sedentary work or light work, and so the VE provided positions requiring sedentary work and light work in response. (Tr. at 61-64) Because the ALJ's final RFC referred only to sedentary work, the Court will only consider the VE's responses regarding sedentary jobs.

to conclude that the jobs either (1) exist in the DOT or (2) match Smith's RFC. In such a circumstance, remand has been required. *See, e.g., Boone v. Barnhart*, 353 F.3d 203, 206-11 (3d Cir. 2003) (finding remand required where three job positions in DOT identified by VE were not appropriate for claimant's RFC, and where the record did not otherwise contain evidence of a significant number of jobs in the national economy that claimant could perform); *Monstrola v. Astrue*, Civil Action No. 07-1220, 2009 WL 602987, at *3-4 (W.D. Pa. Mar. 9, 2009) (same); *cf. Burns v. Barnhart*, 312 F.3d 113, 127-128 (3d Cir. 2002) (finding that VE testimony that claimant could work various jobs was inconsistent with the DOT, where the exact job titles named by the VE could not be found in the DOT).

Second, this portion of the VE's hearing testimony is confusing, a factor that impacts the Court's decision. It is clear that at this stage of the hearing, the ALJ and VE were occasionally having difficulty understanding what the other was referring to—particularly during the portion of the VE's testimony in which she was identifying specific jobs that Smith could perform. (Tr. at 62-63) This lack of clarity makes it difficult to credit certain arguments of the Commissioner as to why no remand is required. For example, the Commissioner suggests that the VE's references to "bench work checker" and "bench worker" were not references to individual jobs, but to broader occupational categories—and that within such categories there were many jobs that "could be performed within the parameters of Plaintiff's RFC."[22] (D.I. 16 at 32) Yet this is

---

[22]     In making this argument, the Commissioner cites to five jobs "within the checker and benchworker occupations" that assertedly could be "performed within the parameters of Plaintiff's RFC." (D.I. 16 at 32-33) In fact, three of these jobs are within the "Benchwork Occupations" category (the other two fall under either "Machine Trade Occupations" or "Processing Occupations"), and all of them, on their face, reference a "light" exertional level (not the sedentary level that was part of claimant's RFC). (*Id.*)

not particularly clear from this portion of the VE's testimony. If anything, the testimony could be

read to suggest that these references were to *individual* jobs within a *broader* occupational

category. (Tr. at 63 ("And then I have bench worker still again in the bench work category")); *cf.*

*Williams v. Barnhart*, 424 F. Supp. 2d 796, 804-805 (E.D. Pa. 2006) (remanding for further

proceedings, in part because the court could not easily reconcile unclear and "uncertain" nature

of the VE testimony with the decision of the ALJ).

     Third, this is not a case where it is otherwise apparent from the record that there are other

jobs existing in the national economy that the claimant can perform. For example, in cases

where there have been inconsistencies between jobs identified by the VE and the content of the

DOT—but where the VE clearly indicated that the specifically-identified jobs were merely

exemplary of many other jobs that a claimant could otherwise perform—courts have concluded

that substantial evidence may still exist to support a finding of disability. *See, e.g., Rutherford*,

399 F.3d at 557-558; *Jones*, 364 F.3d at 506. Yet here, despite the reference in the ALJ's

decision to the VE as having identified "representative occupations[,]" (Tr. at 19), a review of the

hearing transcript indicates that the VE did not clearly cite to any jobs other than the two that she

specifically identified, nor did she otherwise refer to these jobs as exemplary or representative,

(*id.* at 62-63). The Commissioner suggests, to the contrary, that the VE may have done so when

she made a reference to her "experience" during this part of the hearing. (D.I. 16 at 33-34) Yet

this reference was not to the VE's "experience" with *other* jobs that claimant might be able to

perform; instead, it appears clearly to be a reference to her "experience" with the DOT and the

particular "bench worker" position that she had cited and was discussing at that moment. (Tr. at

62

63)[23]

Fourth, as Smith argues, SSR 00-4p "requires that the ALJ ask the vocational expert

whether any possible conflict exists between the vocational expert's testimony and the DOT, and

that, if the testimony does appear to conflict with the DOT, to 'elicit a reasonable explanation for

the apparent conflict.'" *Burns*, 312 F.3d at 127; *see also Green v. Astrue*, Civil Action No.

10-468, 2010 WL 4929082, at *6 (W.D. Pa. Nov. 30, 2010).   In this case, the ALJ did ask the VE

about consistency with the DOT, but in a more limited way than what SSR 00-4p requires.   (Tr.

at 63)   After the VE had been testifying as to whether certain specifically identified jobs allowed

for a person to sit and stand in the manner set out in the ALJ's hypothetical, the ALJ asked:

"[a]nd is that consistent with the criteria that's in the DOT or not?"   (*Id.*)   The VE's answer as to

consistency between the DOT's criteria and her testimony was limited to this "sit/stand" issue.

(Tr. at 63-64 ("Well, the DOT does not use the terminology of sit/stand, but the bench work has

the flexibility for sit/stand, Your Honor."))   The Court is not persuaded that this question was

intended to, or had the effect of, more broadly addressing potential inconsistencies between the

---

[23]      Similarly, the Commissioner states that the DOT lists maximum requirements of
particular jobs, not "the range of requirements of a particular job as it is performed in specific
settings." (D.I. 16 at 33 (citing SSR 00-4p); *see also* SSR 00-4p, 65 Fed. Reg. 75759-01 (Dec. 4,
2000) ("The DOT lists maximum requirements of occupations as generally performed, not the
range of requirements of a particular job as it is performed in specific settings. A VE . . . may be
able to provide more specific information about jobs or occupations than the DOT.")) The
Commissioner then asserts that since the VE made references to her "experience" beyond the
confines of the DOT, even if the DOT lists the jobs at issue as having maximum requirements
that would exceed Smith's RFC, at the hearing, the VE was indicating that she nevertheless
possessed more specific experiential information suggesting that Smith could perform certain of
such jobs. (D.I. 16 at 33-34) Yet, as noted above, the VE did *not* appear here to make reference
to her "experience" in the way suggested by the Commissioner. And it is not even clear to which
jobs (or broader occupational categories) the VE was referring in this part of the hearing. In such
a case, the Court cannot make the inferential assumptions that the Commissioner encourages.

jobs listed by the VE and the contents of the DOT. Further, the ALJ did not otherwise follow up with the VE regarding consistency with the DOT after this exchange.

In the end, the Court is left with an unclear record regarding the VE's testimony—the only evidence relied upon by the ALJ in determining that there were a significant number of jobs in the national economy that Smith could perform, given his RFC. In order to affirm the ALJ's decision in this regard, the Court would have to speculate as to the intent and meaning of the VE's testimony in certain key areas. This the Court cannot do, and thus it cannot find that substantial evidence supports the ALJ's decision in this regard. *See, e.g.*, *Boone*, 353 F.3d at 206-211; *Monstrola*, 2009 WL 602987, at *3-4.

Under these circumstances, remand is appropriate as to this issue. On remand, the ALJ should obtain a clearer record as to whether there were jobs that existed in significant numbers in the national economy that the claimant could perform, given the claimant's RFC in the relevant time period. In doing so, the ALJ should question the vocational expert about any conflict existing between her testimony and any information contained in the DOT, elicit a reasonable explanation for any such conflict (if one exists), and explain in his decision how the conflict was resolved. *See Monstrola*, 2009 WL 602987, at *4.

## IV.   CONCLUSION

For the reasons set forth in this Memorandum Opinion, Smith's motion for summary judgement is GRANTED-IN-PART and DENIED-IN-PART and the Commissioner's motion for summary judgment is DENIED. The Court will remand this matter to the Commissioner for further proceedings consistent with the Memorandum Opinion. An appropriate Order follows.